FEDERAL POWER COMMISSION *v.*
IDAHO POWER CO.

No. 12.   Argued October 20–21, 1952.—Decided November 10, 1952.

18

*Philip Elman* argued the cause for petitioner. With him on the brief were *Acting Solicitor General Stern, Assistant Attorney General Baldridge, Paul A. Sweeney, Morton Liftin, Bradford Ross* and *Willard W. Gatchell.*

*Harry A. Poth, Jr.* and *A. C. Inman* argued the cause and filed a brief for respondent.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

Respondent applied to petitioner under § 4 (e) of the Federal Power Act, 41 Stat. 1065, 49 Stat. 840, 16 U. S. C. § 797 (e), for a license to construct, operate, and maintain a hydroelectric project (known as the Bliss development) on the Snake River in southern Idaho. This project included a dam and power plant occupying some 500 acres of lands of the United States and two transmission lines. These lines for most of their length crossed lands of the United States and joined the company's interconnected primary transmission system.

The United States has power projects in this area; and the Bureau of Reclamation and the Bonneville Power Administration were contemplating the construction of a transmission line which would connect the same areas as respondent's proposed lines. Therefore the Federal Power Commission, on the suggestion of the Secretary of the Interior, authorized the project on conditions specified in paragraph (F) of the order. These conditions, in summary, were that the licensee permit the interconnection of transmission facilities of the United States with the two transmission lines, and the transfer over those lines of energy generated in power plants owned by the United States "in such amounts as will not unreasonably interfere" with the licensee's use of the lines, the United States to pay the licensee for government power so transmitted.

Respondent petitioned for review of the Commission's order. The Court of Appeals held that the Commission had no authority to attach the condition. It entered a judgment that the Commission's order "be modified" and that the cause be remanded to the Commission "for the entry of an order in accordance with the opinion of this Court." That was on May 10, 1951. 89 U. S. App. D. C. 1, 189 F. 2d 665. The Commission moved for a

clarification of the judgment. On September 21, 1951, the Court of Appeals entered a new judgment, stating that the order of the Commission "be, and it is hereby, modified by striking therefrom paragraph (F) thereof, and that the order of the Federal Power Commission herein as thus modified be, and it is hereby, affirmed." The petition for certiorari was filed within 90 days of the amended order but more than 90 days after the first order. The question which therefore lies at the threshold of the case is whether the petition is timely. See 28 U. S. C. § 2101 (c).

*First.* If the court did no more by the second judgment than to restate what it had decided by the first one, *Department of Banking* v. *Pink,* 317 U. S. 264, would apply and the 90 days would start to run from the first judgment. But the court by the second judgment undertook to modify the license. By the first judgment it did no more than keep the Commission within the bounds set by its opinion. On remand the Commission might have reissued the order without the contested conditions or it might have withheld its consent to any license. It is the Commission's judgment on which Congress has placed its reliance for control of licenses. See §§ 6, 10 (a), 10 (g). When the court decided that the license should issue without the conditions, it usurped an administrative function. There doubtless may be situations where the provision excised from the administrative order is separable from the remaining parts or so minor as to make remand inappropriate. But the guiding principle, violated here, is that the function of the reviewing court ends when an error of law is laid bare. At that point the matter once more goes to the Commission for reconsideration. See *Federal Communications Commission* v. *Pottsville Broadcasting Co.,* 309 U. S. 134; *Federal Trade Commission* v. *Morton Salt Co.,* 334 U. S. 37.

The Court, it is true, has power "to affirm, modify, or set aside" the order of the Commission "in whole or in part." § 313 (b). But that authority is not power to exercise an essentially administrative function. See *Ford Motor Co.* v. *Labor Board*, 305 U. S. 364, 373–374; *Siegel Co.* v. *Federal Trade Commission*, 327 U. S. 608. The nature of the determination is emphasized by § 10 (a) which specifies that the project adopted "shall be such as in the judgment of the Commission will be best adapted to a comprehensive plan . . . for the improvement and utilization of water-power development, and for other beneficial public uses." Whether that objective may be achieved if the contested conditions are stricken from the order is an administrative, not a judicial, decision.[1]

*Second.* The power of Congress over public lands, conferred by Art. IV, § 3 of the Constitution, is "without limitations," as we stated in *United States* v. *San Francisco*, 310 U. S. 16, 29. The Court of Appeals, while recognizing that principle, held that Congress had not granted the Commission authority to condition the use of public lands by requiring a public utility to carry government power. It relied on § 201 (f) of the Act which says that "No provision in this Part shall apply to . . . the United States . . . ." The Part referred to is Part II of the Act which set up a system of control over the transmission of electric energy in interstate commerce. It granted the Commission authority, among other things, to direct a public utility to establish physical connection of its transmission facilities with the facilities of other persons en-

---

[1] An argument is made that the Commission's motion for clarification was untimely under the rules of the Court of Appeals governing petitions for rehearing. Assuming, *arguendo*, that the motion was a petition for rehearing within the meaning of those rules, it was entertained and considered on the merits (cf. *Bowman* v. *Loperena*, 311 U. S. 262; *Pfister* v. *Finance Corp.*, 317 U. S. 144, 149) and the new judgment entered was erroneous.

gaged in the transmission or sale of electric energy. § 202 (b). Since that power was not extended to the United States, the court concluded that a license under Part I of the Act could not be conditioned on an interconnection with federal power.

Part I and Part II provide different regulatory schemes. Part II is an exercise of the commerce power over public utilities engaged in the interstate transmission and sale of electric energy. See S. Rep. No. 621, 74th Cong., 1st Sess., p. 17. Part II does not undertake to regulate public lands or the use of navigable streams. That function is covered by Part I, which dates back to the Federal Water Power Act of 1920, 41 Stat. 1063. Section 4 (e) of Part I gives the Commission power to issue licenses to private or public bodies for the purpose of "constructing, operating, and maintaining dams, water conduits, reservoirs, power houses, transmission lines, or other project works necessary or convenient for the development and improvement of navigation and for the development, transmission, and utilization of power across, along, from, or in any of the streams or other bodies of water over which Congress has jurisdiction under its authority to regulate commerce with foreign nations and among the several States, *or upon any part of the public lands and reservations of the United States . . . .*" (Italics added.)

By § 4 (g) the Commission is given authority to investigate the actual or intended occupancy of "public lands" for the purpose of developing electric power and to issue such order as it may find "appropriate, expedient, and in the public interest to conserve and utilize the . . . water-power resources of the region." As already noted, § 10 (a) provides that no license shall be granted unless in the judgment of the Commission the project "will be best adapted to a comprehensive plan . . . for the improvement and utilization of water-power development, and for other beneficial public uses . . .; and if necessary

in order to secure such plan the Commission shall have authority to require the modification of any project . . . before approval." [2]

Under these sections the Commission is plainly made the guardian of the public domain. The requirement that existing lines be fully utilized before additional lines are authorized would seem to be relevant to a decision under § 10 (a) that the project submitted was consonant with the "comprehensive plan" for the waterway. And the Commission might well determine under § 4 (g) that if public lands are to be used for the transmission of power, conservation of the "water-power resources of the region" requires that public power as well as private power be transmitted over them.

Sections 4 and 10 speak specifically of the public domain—waterways and public lands. Section 6 makes each license subject to all the terms and conditions of the Act and to "such further conditions, if any, as the Commission shall prescribe in conformity with this Act . . . ." Section 6, read in the context of §§ 4 and 10, would seem to give ample authority to the Commission to attach the conditions imposed here. Protection of the public domain, conservation of water-power resources, development of comprehensive plans for the waterways—each of these might on the facts of a case be sufficient to authorize the grant of permission to a public utility company to use the public domain provided it agreed to use its excess capacity to transmit government power.

It is difficult for us to read § 201 (f) as in any way affecting that power. Sections 201 (f) and 202 deal with interconnections of facilities generally. They do not extend the new powers granted by Part II to government

---

[2] Sections 4 (e) and 10 (a) appeared in the Federal Water Power Act of 1920, 41 Stat. 1063, 1065, 1068. Section 4 (g) was added by the Public Utility Holding Company Act of 1935, 49 Stat. 838, 841.

lines. On the other hand they do not purport to change or alter any power granted under Part I. They do not deal with the grant of licenses. They do not purport to lay down conditions for the issuance of licenses for use of the public domain. We therefore cannot construe the limitation on the new powers conferred by Part II as a repeal by implication of the powers over licensees that are deeply engrained in Part I of the Act and put there by the Congress for the purpose of protecting the public domain.

*Reversed.*

MR. JUSTICE BURTON and MR. JUSTICE CLARK took no part in the consideration or decision of this case.