**UTAH POWER AND LIGHT COM-
PANY, Appellant,**

v.

**Rogers C. B. MORTON et al.,
Appellees.**

**No. 73–1150.**

United States Court of Appeals,
Ninth Circuit.

Sept. 20, 1974.

Marvin J. Bertoch (argued) of Ray, Quinney & Nebeker, Salt Lake City, Utah, for appellant.

Neil T. Proto, Asst. Atty. Gen., (argued), Appellate Section, Land and Natural Resources Div., U. S. Dept. of Justice, Washington, D. C., for appellee.

Before BARNES and WALLACE, Circuit Judges, and FERGUSON,* District Judge.

## OPINION

BARNES, Circuit Judge:

This is an appeal by the Utah Power and Light Company from an order of the District Court for the District of Idaho, granting the Secretary of the Interior's motion for judgment on the pleadings and sustaining the authority of the Secretary of the Interior to promulgate regulations requiring any private utility company seeking a right-of-way across public lands for the construction and operation of electric transmission lines, to transmit or "wheel"[1] electric energy from a federal hydroelectric generating facility over the excess capacity of the proposed transmission wires in the manner provided for in 43 C.F.R. 2851.1–1(a)(5) (1971), enacted pursuant to 43 U.S.C. § 961.

On January 5, 1969, appellant Utah Power and Light Company (hereinafter "Utah Power") filed an application for a right-of-way across 2.01 miles of United States vacant land to construct a 69 kilovolt transmission line between Utah Power's Camas and Dubois substations in Idaho. Appellant requested that the wheeling requirement imposed by 43 C.F.R. 2851.1–1(a)(5), which requires that the grantee of a right-of-way across public lands agrees to wheel government power over surplus capacity in its own private power lines, be waived.

The Idaho Land Office of the Bureau of Land Management granted the permit, but informed appellant it would not consent to a waiver of the clause. The

Secretary of the Interior, through the Interior Board of Land Appeals, affirmed the decision of the Idaho Office on November 5, 1971 (R. 16), and Utah Power filed its complaint in the district court seeking to have the regulation declared invalid and in excess of the Secretary's authority. The district court issued its order on November 3, 1972, sustaining the Secretary's authority to promulgate the wheeling regulation.

"The Court, after considering the arguments and briefs of counsel, and being fully advised in the matter, ruled that the 'wheeling' requirements and attendant provisions contained in 43 C.F.R. 2851.1–(a)(5) [2851.1–1(a)(5)] constitute a reasonable and lawful exercise of the Secretary of Interior's administrative discretion and that said regulation is within the scope of authority delegated to the Secretary under Title 43, United States Code, Section 961." (R. 63)

A timely notice of appeal was filed November 30, 1972. This Court's jurisdiction rests on 28 U.S.C. § 1291.

The sole issue presented on appeal is whether the Secretary of Interior has the authority to issue a right-of-way permit under 43 U.S.C. § 961, to a private utility company to construct electric transmission wires over public lands and condition the use of the right-of-way on the adherence to the wheeling privileges contained in 43 C.F.R. 2851.1–1(a)(5). Appellant argues that the trial court was in error in ruling that: (1) the wheeling provision of the regulations is within the scope of authority delegated to the Secretary; (2) the wheeling provision constitutes a reasonable exercise of authority granted to the Secretary; (3) the wheeling provision was not in violation of appellant's Fifth Amendment protection against deprivation of

---

* Honorable Warren J. Ferguson, District Judge, Central District of California, sitting by designation.

1. "Wheeling" is the transmission of one company's power over another company's sys-

tem. Idaho Power Co. v. Federal Power Commission, 346 F.2d 956, 957, n. 1 (9th Cir. 1965).

property without due process of law. We affirm.

## I. *Analysis of Legislative History*

The Act of February 15, 1901, 31 Stat. 790, 43 U.S.C. § 959, for the first time provided for the issuance of revocable permits for rights-of-way through public lands under general regulations fixed by the Secretary of the Interior. In 1911 Congress amended the earlier enactment to allow the Secretary to grant permits for a period not exceeding fifty years from the date of issuance. The statute, as amended, now reads in pertinent part:

"The head of the department having jurisdiction over the lands be and he is, authorized and empowered, *under general regulations* to be fixed by him, to grant an easement for rights-of-way, for a period not exceeding fifty years from the date of the issuance of such grant, over, across, and upon the public lands and reservations of the United States for electrical poles and lines for the transmission and distribution of electrical power . . . ." 43 U.S.C. § 961 (Emphasis added.)

Pursuant to the statutory authority to promulgate general regulations, the Secretary of the Interior, on March 23, 1963 issued the wheeling regulation here in controversy,[2] 43 C.F.R. 2234.4–

1(a)(5), redesignated in 1971 as 43 C.F.R. 2851.1–1(a), (1)(a)(5) and (1)(b),[3] which reads as follows:

§ 2851.1  *Nature of interest.*

§ 2851.1–1  *Terms and conditions.*

(a) By accepting a right-of-way for a power transmission line, the applicant thereby agrees and consents to comply with and be bound by the following terms and conditions, excepting those which the Secretary may waive in a particular case, in addition to those specified in § 2801.1–5.

(5) An applicant for a right-of-way for a transmission facility having a voltage of 33 kilovolts or more must, in addition to the requirements of § 2802, execute and file with its application a stipulation agreeing to accept the right-of-way grant subject to the following conditions:

(i) In the event the United States, pursuant to law, acquires the applicant's transmission or other facilities constructed on or across such right-of-way, the price to be paid by the United States shall not include or be affected by any value of the right-of-way granted to the applicant under authority of the regulations of this part.

(ii) The Department of the Interior shall be allowed to utilize for the transmission of electric power and energy any surplus capacity of the transmission

2. At the time of issuing the regulation the Secretary states:
  "The regulations are first a matter of conservation. We felt that it was important to set forth now the basic principle that where one transmission line crossing Government lands can do the job all reasonable efforts should be made to avoid additional lines. This principle is important when one considers the rapidly growing needs of the future for more and more transmission line facilities. The regulations were also issued so that the Department could carry out better its responsibilities for the marketing of power." Public Land Law Review Commission, Use and Occupancy, Vol. I Report, Chapters 1–9, p. VII–41.

3. In 1948 the Secretary of the Interior promulgated a wheeling regulation similar to

the one here, but it was rescinded in 1954. Public Land Law Review Commission, *supra* at VII–39. *See* 43 C.F.R. 225.91(v) (1954), redesignated 244.44(e) (rescinded August, 1954).

In hearings looking into the reasons for eliminating the wheeling requirement, it was apparent that the reasoning for such action was not premised on any lack of authority of the Secretary to promulgate a wheeling requirement or interfere with the use of a private utility's transmission line. The Committee's conclusions indicated affirmative support for the wheeling regulation. Certain Activities Regarding Power, Dept. of Interior, Hearings Before a Subcomm. of the House Comm. on Government Operations, 84th Cong., 1st Sess., at 3 (1956). (Hereinafter "Certain Activities Regarding Power Hearings.")

facility in excess of the capacity needed by the holder of the grant (subsequently referred to in this paragraph as "holder") for the transmission of electric power and energy in connection with the holder's operations, or to increase the capacity of the transmission facility at the Department's expense and to utilize the increased capacity for the transmission of electric power and energy. Utilization by the Department of surplus or increased capacity shall be subject to the following terms and conditions:

(*a*) When the Department desires to utilize surplus capacity thought to exist in the transmission facility, notification will be given to the holder and the holder shall furnish to the Department within 30 days a certificate stating whether the transmission facility has any surplus capacity not needed by the holder for the transmission of electric power and energy in connection with the holder's operations and, if so, the amount of such surplus capacity.

(*b*) Where the certificate indicates that there is no surplus capacity or that the surplus capacity is less than that required by the Department the authorized officer may call upon the holder to furnish additional information upon which its certification is based. Upon receipt of such additional information the authorized officer shall determine, as a matter of fact, if surplus capacity is available and, if so, the amount of such surplus capacity.

(*c*) In order to utilize any surplus capacity determined to be available, or any increased capacity provided by the Department at its own expense, the Department may interconnect its transmission facilities with the holder's transmission facility in a manner conforming to approved standards of practice for the interconnection of transmission circuits.

(*d*) The expense of interconnection will be borne by the Department, and the Department will at all times provide and maintain adequate protective equipment to insure the normal and efficient operation of the holder's transmission facilities.

(*e*) After any interconnection is completed, the holder shall operate and maintain its transmission facilities in good condition, and, except in emergencies, shall maintain in a closed position all connections under the holder's control necessary to the transmission of the Department's power and energy over the holder's transmission facilities. The parties may by mutual consent open any switch where necessary or desirable for maintenance, repair or construction.

(*f*) The transmission of electric power and energy by the Department over the holder's transmission facilities will be effected in such manner, as will not interfere unreasonably with the holder's use of the transmission facilities in accordance with the holder's normal operating standards, except that the Department shall have the exclusive right to utilize any increased capacity of the transmission facility which has been provided at the Department's expense.

(*g*) The holder will not be obligated to allow the transmission of electric power and energy by the Department to any person receiving service from the holder on the date of the filing of the application for a grant, other than statutory preference customers including agencies of the Federal Government.

(*h*) The Department will pay to the holder an equitable share of the total monthly cost of that part of the holder's transmission facilities utilized by the Department for the transmission of electric power and energy, the payment to be an amount in dollars representing the same proportion of the total monthly cost of such part of the transmission facilities as the maximum amount in kilowatts of the power transmitted on a scheduled basis by the Department over the holder's transmission facilities bears to the total capacity in kilowatts of that portion of the transmission facilities. The total monthly cost will be determined in accordance with the system of accounts prescribed

by the Federal Power Commission, exclusive of any investment by the Department in the part of the transmission facilities utilized by the Department.

(*i*) If, at any time subsequent to a certification by the holder or determination by the authorized officer that surplus capacity is available for utilization by the Department, the holder needs for the transmission of electric power and energy in connection with its operations the whole or any part of the capacity of the transmission facility theretofore certified or determined as being surplus to its needs, the holder may request the authorized officer to modify or revoke the previous certification or determination by making application to the authorized officer not later than 36 months in advance of the holder's needs. Any modification or revocation of the certification or determination shall not affect the right of the Department to utilize facilities provided at its expense or available under a contract entered into by reason of the equitable contract arrangements provided for in this section.

(*j*) If the Department and the holder disagree as to the existence or amount of surplus capacity in carrying out the terms and conditions of this paragraph, the disagreement shall be decided by a board of three persons composed as follows: The holder and the authorized officer shall each appoint a member of the board and the two members shall appoint a third member. If the members appointed by the holder and the authorized officer are unable to agree on the designation of the third member, he shall be designated by the Chief Judge of the United States Court of Appeals of the circuit in which the major share of the facilities involved is located. The board shall determine the issue and its determination, by majority vote, shall be binding on the Department and the holder.

(*k*) As used in this section, the term "transmission facility" includes (*a*) all types of facilities for the transmission of electric power and energy and facilities for the interconnection of such facilities, and (*b*) the entire transmission line and associated facilities, from substation or interconnection point to substation or interconnection point, of which the segment crossing the lands of the United States forms a part.

(*l*) The terms and conditions prescribed in this paragraph may be modified at any time by means of a supplemental agreement negotiated between the holder and the Secretary of the Interior or his designee.

(b) Unless otherwise specified in a right-of-way granted under the act of March 4, 1911, and unless sooner canceled, the right-of-way shall expire 50 years from the date thereof. If, however, within the period of 1 year prior to the expiration date, the grantee shall file, in accordance with § 2802.1, a written application to renew the right-of-way, and shall agree to comply with all the laws and regulations existing at such expiration date governing the occupancy and use of the lands of the United States for the purpose desired, the right-of-way may be renewed for a period of not to exceed 50 years. If such application is filed, the existing right-of-way will be extended subject to then existing and future rules and regulations, pending consideration of the application.

(31 Stat. 790, 36 Stat. 1253; 43 U.S.C. §§ 959, 961)

■ Utah Power's argument that the Secretary of the Interior exceeded his statutory authority by issuing the wheeling regulation, which attaches a condition to grants of rights-of-way over public lands, places considerable emphasis on the regulatory authority delegated to the Federal Power Commission to control the activities of utility companies. It appears to be Utah Power's position that the Federal Power Act of June 10, 1920, 41 Stat. 1063, as amended by sections 201–213 inclusive, of the act of August 26, 1935, 49 Stat. 838, 16 U.S.C. §§ 791–825r, pre-empts any authority given to the Secretary by the 1911 right-of-way statute, 43 U.S.C. § 961, to

regulate the transmission and sale of electricity by placing the plenary jurisdiction for the regulation thereof in the Federal Power Commission (herein sometimes "F.P.C."), rather than the Department of the Interior. (Appellant's Brief p. 21; *see also* pp. 11–12, 20–23, 32, 35–41 and Reply Brief p. 2, n. 1). With this we do not agree.

Included amont the regulations governing the conditions under which grants of rights-of-way are to be issued, is an explanation of the relationship between the 1911 statute and the Federal Power Act. The latter superseded the earlier Acts, but twice specifically excepted distribution lines, *i. e.*, non-primary transmission lines.

"(c) The applicability of the acts of February 15, 1901, and March 4, 1911, to rights-of-way for power purposes over public lands, was superseded by the Federal Power Act of June 10, 1920 (41 Stat. 1063), as amended by sections 201 to 213, inclusive of the act of August 26, 1935 (49 Stat. 838; 16 U.S.C. 791–825r), as to power projects for the generation and transmission of hydroelectric power, defined in section 3(11) of the act, excepting distribution lines. Applications for hydroelectric power plant sites or rights-of-way for main or primary hydroelectric power transmission lines must be made to the Federal Power Commission, Washington, D. C. under the act of June 10, 1920, as amended. *Rights-of-way for transmission lines which are not primary lines must be secured under the act of February 15, 1901, or the act of March 4, 1911.* See 18 C.F.R. 2.2." 43 C.F.R. 2850.-0–3(c) (Emphasis added.)

Both parties agree that here we are concerned with a right-of-way for non-

primary transmission lines. (Appellee's Brief p. 22, n. 20, p. 44, n. 37; Appellant's Reply Brief p. 2, n. 1) Part I of the Federal Power Act, 16 U.S.C. §§ 791a–823h, limits the licensing jurisdiction of the Federal Power Commission to power plants for the generation of hydroelectric power, and to main or primary hydroelectric transmission lines, while permits for steam plants and easements for steam power transmission lines and easements for hydroelectric power lines that are not primary or main lines are still governed by the 1901 and 1911 right-of-way acts. 18 C.F.R. 2.2.[4] "Thus, an easement for the latter would not be granted by the Federal Power Commission but would be granted by the Secretary of the Interior or the departmental head having jurisdiction over the lands involved." (Appellant's Reply Brief, pp: 2–3, n. 1).

Utah Power argues that it is engaged in interstate commerce and under Parts II and III of the Federal Power Act, 16 U.S.C. §§ 824–824h, 825–825t, the F.P.C. has plenary authority to regulate various aspects of the transmission of energy in interstate commerce.

Utah Power's argument relying upon Part II of the Federal Power Act was explicitly met by the Supreme Court in the case of Federal Power Commission v. Idaho Power Co., 344 U.S. 17, 73 S.Ct. 85, 97 L.Ed. 15 (1952). In *Idaho Power* the Court considered a challenge to the authority of the F.P.C. to impose a wheeling requirement upon a private utility seeking to construct primary transmission lines across public lands. The Court in concluding that the Commission had the authority under Part I of the Act, when granting a license for a primary line, to require wheeling when the proposed lines would cross public

4. "§ .2 Transmission lines

In a public statement dated March 7, 1941, the Commission announced its determination that transmission lines which are not primary lines transmitting power from the power house or appurtenant works of a project to the point of junction with the distribution systems as set forth in section

3(11) of the act are not within the licensing authority of the Commission, and directed that future applications filed with it for such licenses be referred for appropriate action to the Federal department having supervision over the lands or waterways involved."

lands, observed that an express limitation upon the Commission's authority to require wheeling under Part II existed. *Id.* at 21, 73 S.Ct. 85. The reference was to § 201(f) of the Act, 16 U.S.C. § 824(f) which states: "No provision in [section 824–824h] [Part II] of this title shall apply to, or be deemed to include, the United States." This provision in Part II of the Act would appear to rebut appellant's argument that the F.P.C. through interstate commerce has the authority to regulate Utah Power by means of a wheeling requirement under Part II, and not the Secretary of the Interior.[5]

Congress' intent to give the Secretary of the Interior broad authority under the 1911 right-of-way statute is not clearly demonstrated by reviewing the congressional debate surrounding its enactment. 46 Cong.Rec., 4014–4020 (daily ed., March 4, 1911). There is discussion to the effect that the Secretary should enact regulations to protect the public lands from interference or abuse, *Id.* at 4020. But, we agree with appellant this does not support the Secretary's authority to promulgate a wheeling requirement.

However, we agree with the statement by the Department of the Interior made in an administrative decision involving the same issue as that which confronts us here, *i. e.,* whether the act of 1911 supports the Secretary's promulgation of a wheeling regulation. This was in Southern California Edison Company, 71 I.D. 405, 409–411 (1964) which reads:

"Its [The Act of 1911] intent is that such lines not be placed thereon by right and at random. Its intent on its face is that transmission lines be placed on Government lands under the terms and conditions the Government department responsible for the overall welfare of those lands believes transmission lines should be placed thereon.

Where the permit is to endure for fifty years and is not to be revocable at the will of the Government, the act requires such regulations as will protect Government interests associated with Government lands for the next 50 years. Had the Sixty-first Congress intended permits to be issued summarily—had it intended them to be issued if the applicants met the one, two, or three standards, the Sixty-first Congress in March 1911 thought should govern the placement of transmission lines on Government lands—the Sixty-first Congress would have said so. It legislated differently. Having stated its specific purpose and intent, Congress directed the departments responsible for Government lands to treat by such regulations as they in their expertise deemed appropriate, such developments and exigencies that should materialize during the life of the law that affected the placement of transmission lines on Government lands.

We think a regulation requiring a permittee to let the Government use surplus capacity in a transmission line permittee would build on Government's lands, is uniquely within the purview and intent of the 1911 transmission line act. The use of the transmission lines of one electric system to wheel, convey, or market the power and energy of and for another system is a widespread, long-established operating practice in the power industry. So is the interconnection and the joint use of transmission facilities by two or more different systems; and so is the purposeful overbuilding of transmission line capacity in anticipation of future load growth.

---

5. Another source of rejection for appellant's argument is that Part II does not regulate public lands. *Idem.* 344 U.S. at 22, 73 S.Ct. 85. That function is covered by Part I. Here, the application is for a right-of-way over public land and although the issue concerns the Secretary of the Interior's authority to condition such a grant by means of a wheeling requirement, the ultimate grant concerns a regulation of public lands; and thus the 1911 statute prevails here over either Part I (because of non-primary transmission lines) or Part II of the Federal Power Act.

The Federal Government is the largest wholesale producer of electric power and energy in the Nation. Its installed generating capacity of about 26 million kilovolts comprises 17 percent of all electric utility generating capacity in the country. Its installed hydroelectric capacity accounts for about 45 percent of the Nation's developed hydroelectric capacity. We are advised by the Assistant Secretary, Water and Power Development, that another 8.8 million kilovolts of Federal generating capacity is under construction; and still another 10.2 million kilovolts has been approved or authorized for future construction. The statutes under which this Federal power and energy is produced require that preference in the sale thereof be given to governmental agencies and to nonprofit organizations. This requirement originated contemporaneously with the transmission line right-of-way laws in question. It began with section 5 of the act of April 16, 1906 (34 Stat. 116, 117), requiring the Secretary of the Interior to give preference to municipal purposes when disposing of power produced at Federal reclamation projects in the western United States under the act of June 17, 1902 (32 Stat. 388). It was restated by the act of February 24, 1911 (36 Stat. 930); and it has been affirmed by a long series of statutes enacted and re-enacted down to the present. To avoid constructing the transmission lines needed to market this power and energy, the Government utilizes the transmission facilities of other systems to the maximum extent practicable. This wheeling service that utility systems perform for the Federal Government is based on 'the principle of coordination and cooperation * * * the very purpose of which is to make use of company transmission line facilities to avoid duplication and waste of Government funds' for transmission lines."

As appellee contends and the above quotation supports, the Secretary of the Interior had already initiated federal hydroelectric projects before the 1911 statute was enacted. The Federal Power Marketing Policy, which substantially began with the Boulder Canyon Project Act of 1928, 45 Stat. 1057, 43 U.S.C. §§ 617–617u; and includes the Bonneville Project Act of 1937, 50 Stat. 731, 16 U.S.C. § 832 et seq.; The Flood Control Act of 1936, 49 Stat. 1570, 33 U.S.C. § 701b et seq.; the Fort Peck Act of 1938, 52 Stat. 403, 16 U.S.C. § 833 et seq.; the Reclamation Project Act of 1939, 53 Stat. 1187, 43 U.S.C. §§ 375, 387–389, 485–485k and the Flood Control Act of 1944, 58 Stat. 890, 16 U.S.C. § 825s although admittedly not directly related to the 1911 statute, does indicate a Congressional policy of giving the Secretary a broad scope of responsibility in implementing Federal Power Projects.

■ Similarly, the express language in the 1911 act had authorized the Secretary, by means of general regulations, to condition grants of rights-of-way in a manner best serving the public interest. Since the permit to use the public land may be for 50 years, when we consider the fact that there was no specific Congressional intent expressed as to the manner in which the public interest shall be protected for those 50 years, the wheeling requirement represents a logical and presumably effective means of protecting the public interest in the public lands over which rights-of-way are granted. Unless we find such a regulation unreasonable in its content, we see no reason from the legislative background to hold that the wheeling requirement is beyond the scope of the Secretary's authority under 43 U.S.C. § 961.[6] We do not find that the appellant

6. On November 16, 1973, Congress enacted the "Trans-Alaska Pipeline Authorization Act," Pub.L.No.93–153, 87 Stat. 576 (1973). Although in its final form that act does not affect the facts here, its provisions and legislative history are instructive. 2 U.S.Code Cong. & Admin.News, pp. 2417–2534 (1973).

In its initial form, S–1081 93d Cong., 1st Sess. (1973), 119 Rec.S. 13699 (daily ed. July 17, 1973), the Act would have been ap-

has met his burden of proof to show the challenged regulation is an unreasonable exercise of a delegated power, "i. e., inconsistent with the statute." · United States v. Boyd, 491 F.2d 1163 (9th Cir. 1973); Boske v. Comingore, 177 U.S. 459, 470, 20 S.Ct. 701, 44 L.Ed. 846 (1899).

## II. *The Idaho Power Cases and The Chapman Case.*

Since we find no case which directly concerns the Secretary's authority challenged here, we turn to an analysis of cases argued by both sides as being analogous and relevant to our decision on appeal.

Appellee asserts that the Secretary's wheeling requirement has been judicially sustained in a similar context by the Supreme Court in *Idaho Power* (1952) and by this Court in Idaho Power Co. v. Federal Power Commission, 346 F.2d 956 (9th Cir. 1965), cert. denied, 382 U. S. 957, 86 S.Ct. 435, 15 L.Ed.2d 361 (1965); and that these decisions are dispositive of the present controversy. (Appellee's Brief p. 11).

Appelllant, on the other hand, argues that the District of Columbia Circuit case of Chapman v. El Paso Natural Gas

Co., 92 U.S.App.D.C. 154, 204 F.2d 46 (1953) requires us to find that the "right of way statute did not confer upon the Secretary so vast and detailed a power as the promulgation of specific regulations and conditions governing the 'operations' of an applicant." (Appellant's Reply Brief p. 7).

In the Supreme Court's *Idaho Power* case, discussed above, the Court was concerned with the authority of the F.P.C. to impose a wheeling requirement. In presenting the facts the Court took particular note of the Federal Power Marketing Policy and the responsibility of the Secretary thereunder:

"The United States has power projects in this area; and the Bureau of Reclamation and the Bonneville Power Administration were contemplating the construction of a transmission line which would connect the same areas as respondent's proposed lines. Therefore the Federal Power Commission, on the suggestion of the Secretary of the Interior authorized the project on conditions specified in paragraph (F) of the order. These conditions, in summary, were that the licensee permit the interconnection of transmission facilities of the United

---

plicable to the facts here, except that it was passed subsequent to the events here. Section 101(a)(5) stated that the Secretary is authorized to grant rights-of-way for:

"(5) Systems for generation, transmission, and distribution of electric energy, except insofar as the Federal Power Commission has jurisdiction under the Act of June 10, 1920, as amended (16 U.S.C. 796, 797);"

Section 112 authorized the Secretary to promulgate regulations:

"*Provided, however,* That notwithstanding any other provision of this Act, neither the Secretary nor any agency head by regulation, by stipulation or conditions for right-of-way grants or renewals, or by any other means shall use the position of the Federal Government as landowner to accomplish, indirectly, public policy objectives unrelated to protection or use of the public lands except as expressly authorized by statute."

This particular provision was added to the Senate Bill as an amendment to prevent any

abuse of the broad discretion provided by this legislation to the Secretary of the Interior to implement policy not specifically authorized by Congress. S.Rep.93–207, Senate Comm. on Interior and Insular Affairs, 93rd Cong., 1st Sess., pp. 114–116 (Views of Senators Buckley, McClure and Bartlett), 2 U.S.Code, Cong. & Admin.News at pp. 2520–2522 (1973). The amendment was designed to:

"restrict authority delegated to the Secretary or agency head in order to prevent either from imposing by indirection any type of condition on federal rights-of-way not expressly authorized by statute." *Id.* at p. 2521.

However, the House Conference Report, No. 93–617, 93rd Cong., 1st Sess. (1973), 119 Cong.Rec. H9502 (daily ed. Oct. 31, 1973), amended the Senate Bill and limited the grants of rights-of-way only to oil and gas pipelines with the understanding of considering broader right-of-way legislation in connection with other bills. 119 Cong.Rec., *supra* at H9507.

States with the two transmission lines, and the transfer over those lines of energy generated in power plants owned by the United States 'in such amounts as will not unreasonably interfere' with the licensee's use of the lines, the United States to pay the licensee for government power so transmitted." 344 U.S. at 19, 73 S.Ct. at 86.

In discussing the authority of the Commission, the Court stated:

"Under these sections the Commission is plainly made the guardian of the public domain. The requirement that existing lines be fully utilized before additional lines are authorized would seem to be relevant to a decision under § 10(a) that the project submitted was consonant with the 'comprehensive plan' for the waterway. And the Commission might well determine under § 4(g) that if public lands are to be used for the transmission of power, conservation of the 'water-power resources of the region' require that public power as well as private power be transmitted over them.

Sections 4 and 10 speak specifically of the public domain—waterways and public lands. Section 6 makes each license subject to all the terms and conditions of the Act and to 'such further conditions, if any, as the Commission shall prescribe in conformity with this Act. . . .' Section 6, read in the context of §§ 4 and 10, would seem to give ample authority to the Commission to attach the conditions imposed here. Protection of the public domain, conservation of water-power resources, development of comprehensive plans for the waterways— each of these might on the facts of a

case be sufficient to authorize the grant of permission to a public utility company to use the public domain provided it agreed to use its excess capacity to transmit government power." 344 U.S. at 23, 73 S.Ct. at 88. (Emphasis added.)

Appellee contends that in analogous fashion, the Secretary has similar authority under the right-of-way statute. In this Court's *Idaho Power Co.*, *supra* (1965), a similar issue was addressed. There the power company sought authority to. construct two additional transmission lines in connection with its already licensed hydroelectric project on the Snake River, Idaho. Authority was granted to amend the license provided the petitioner make surplus capacity of the project's transmission facilities available to the Government for the wheeling of Government power at Government expense. Idaho Power Company challenged the authority of the Commission to impose such a condition.[7]

We affirmed the condition suggested by the Secretaries of the Interior and Agriculture, relying on the reasoning by the Supreme Court in the earlier *Idaho Power* case. 346 F.2d at 959–960.

Appellant relies on the *Chapman* case. In *Chapman*, El Paso Natural Gas Company had entered into negotiations with the Secretary of Interior concerning grants of rights-of-way for a proposed gas pipeline. Under section 28 of the Mineral Leasing Act of 1920, 41 Stat. 449 (1920) as amended 49 Stat. 678 (1938), 30 U.S.C. § 185 (1953) (amended 1973), such rights-of-way "may be granted by the Secretary of Interior . . . under such regulations and conditions . . . as may be prescribed by the Secretary . . ." The

7. We note that the F.P.C. sought the advice of the Secretary of the Interior.

"The Secretary of the Interior recommended that any authorization for construction of the lines should be conditioned upon the Commission's reserving the right to require petitioner to wheel Government power over the company's entire main transmission system. He explained that this might enable the Government to defer

construction by the Bonneville Power Administration of a high-capacity line connecting the main Federal Columbia River Power System to the Upper Snake River System; that Bureau of Reclamation plants in Southern Idaho would shortly be unable to meet their power requirements and would need a part of Bonneville's surplus." 346 F.2d at 958.

Secretary originally acted to require El Paso to sign a stipulation that it would operate ". . . as a common carrier in accordance with the provisions of the Mineral Leasing Act . . ." 204 F. 2d at 48, n. 1. But as the construction progressed additional rights-of-way were granted. Then the Secretary took the position that the remaining rights-of-way would not be granted unless El Paso signed a detailed stipulation concerning common carrier obligations and including a provision for increased capacity of the pipeline. El Paso took the position that the stipulation was beyond the Secretary's authority under the statute. The court held that the Secretary's authority under the statute, which expressly provided authority for regulations and conditions as to survey, location, application and use, was limited to physical aspects of the rights-of-way and did not extend to the actual operations of the pipeline. 204 F.2d at 51. Thus, appellant asserts that here the Secretary is regulating the operations of a power company by conditioning the grant of a right-of-way for purposes unrelated to the right-of-way statute and *Chapman* is authority preventing the Secretary from acting in this manner.

However, as we stated previously, we do not find that the Secretary is regulating the operations of Utah Power by means of the wheeling requirement, but is acting within the authority provided by the right-of-way statute to protect the public interest.

The Mineral Leasing Act, 30 U.S.C. § 185, prior to its amendment in 1973, and at issue in *Chapman*, expressly provided a built-in protection of the public interest. The court there stated:

"Ample protection of the public interest exists, and adequate enforcement of the condition is possible, under the provision for forfeiture of the grant by the United States District Court, in an appropriate proceeding, for failure to comply with the provisions of the section or with appropri-ate regulations and conditions established by the Secretary." 204 F.2d at 51.

The right-of-way statute at issue here, 43 U.S.C. § 961, does not expressly provide any such protection. The only forfeiture provision is for "nonuse for a period of two years or for abandonment." Instead the Congress directed the Secretary to use his expertise to determine what might be deemed appropriate to protect the public interest under the right-of-way statute. Although we acknowledge certain problems may well be caused by the wheeling requirements on appellant's ability to transmit power (Appellant's Brief pp. 28–33), on balance we find that protection of the public interest in public lands in this situation must prevail.

A final distinction between the *Idaho Power* cases and *Chapman* exists. In *Chapman* the court recognized a distinction between the facts there and those in the Supreme Court *Idaho Power* case.

"Similarly, F.P.C. v. Idaho Power Co., 1952, 344 U.S. 17, 73 S.Ct. 85, 97 L. Ed. 15, decided by the Supreme Court since we heard the present case, is not in point, in spite of some apparent similarities. There, the Court held that the Judiciary was without power to modify conditions attached to a license, the function of a reviewing court being at an end when it laid bare an error of law. *But we are not dealing here with an order which seeks to compel the granting of a license in futuro or the modification and alteration of conditions embodied in the license prior to its issuance, but with an order which would simply require the Secretary to execute the purely ministerial act of issuing rights-of-way pursuant to what we regard as a license granted previously without condition.*" 204 F.2d at 53 (Emphasis added.)

Thus, *Chapman* was concerned with a license previously issued without condition, the expenditure of millions of dol-

lars by the licensee in reliance thereon, and a later attempt to alter the license. The earlier *Idaho Power* case involved a license not yet granted and modification and alteration of conditions prior to issuance, which is what *Utah Power* is attempting to do here.[8] Our later opinion in *Idaho Power* (1965) concerned a proposed amendment of the original license which had originally left some of the final terms open pending later agreement.

The distinction between attaching a condition to a license prior to issuance, and that of altering a license already existing by attaching a new condition is readily explained by reference to contract law. The distinction is between negotiating the terms of a contract *prior* to entering into a contract (which Utah Power was attempting to do by having the Secretary waive the wheeling requirement), and altering a contract previously entered into. The latter requires agreement by both parties (which explains the *Chapman* holding). *See* 4 Williston, Contracts § 591 (3d ed. 1961). Thus, we agree with appellee that the Supreme Court's reasoning in *Idaho Power* (1952) and our decision in *Idaho Power* (1965) support the Secretary's

authority to promulgate the wheeling requirement.

Furthermore, our attention was drawn to the unpublished Memorandum Opinion in Idaho Power Company v. Chapman, No. 4540–50 (D.D.C.1952) and supplemental memorandum of October 31, 1952 (Appellee's Brief pp. 62–72) in which the issue of the Secretary of the Interior's wheeling regulation was fully explored and upheld.[9]

## III. *Reasonableness of the Wheeling Provision*

▇ We repeat, the substance of the contested regulation (43 C.F.R. 2851.1–1(a)(5)) provides that the Department of Interior have the use of any surplus capacity in the holder's transmission line crossing public lands (in excess of the capacity needed by the holder) and that the Department may increase the capacity. The expense of interconnection to use surplus capacity or to increase capacity is borne by the Department in a manner insuring the normal and efficient operation of the holder's transmission facilities (subpara. (c) and (d)). Any disagreement in surplus capacity is to be adjudicated by a three-man board

---

8. "Unlike *Chapman* 'we are . . . dealing here with an order which seeks to compel the granting of a license *in futuro* or the modification and alteration of conditions embodied in the license prior to its issuance.' (ibid at 53). The stipulation here does not undertake 'to exercise so vast and so detailed a power;' nor 'such intimate regulation of corporate affairs as the financing, construction and employment of facilities' (at 51) [204 F.2d at 51]" 71 I.D. at 412, n. 17.

9. The District Court stated at pages 6–7 of said unpublished opinion:
"17. The joint use of power transmission lines by different private companies or by private companies and governmental agencies is a well established practice in the industry. The use of a transmission line through the medium of a wheeling arrangement is not injurious to the line nor does it interfere with the use thereof by

the owning company. Ordinarily, wheeling arrangements constitute a source of revenue to the owning company in that under such arrangements rentals are received for equipment that would otherwise be unused. Wheeling arrangements also obviate the necessity of constructing duplicate transmission facilities. The wheeling arrangements called for in the defendant's regulations provide for a reasonable rental and, as far as physical and financial effects are concerned, do not differ substantially from ordinary contract wheeling arrangements."
Finding 17 of the unpublished *Chapman* opinion was a topic of discussion in the previously mentioned Certain Activities Regarding Power Hearings at 142, *supra* n. 3 of this opinion.
We recognize this language has no precedential value to this Court, but is apparently the law of the case in the District of Columbia Circuit, (Rule 8(b) D.C.Cir. Rules.)

(subpara. (j)). When for his own operations the owner needs to recover his surplus capacity he must give the Department 36 months notice (subpara. (i)). In transmitting electric power and energy over the holder's transmission facilities, the Department shall not unreasonably interfere with the owner's operation (subpara. (f)); it may not, without the owner's consent use his surplus capacity to supply customers the owner was serving when he applied for the permit unless they are preference customers (subpara. (g)). The Department must pay an equitable share of the total cost of that part of the holder's transmission facilities utilized by the Department (subpara. (h)).

On its face, we believe that such a wheeling regulation is reasonable. It does not in substance differ greatly from that wheeling provision approved by this Court in the *Idaho Power* case, *supra*, 346 F.2d at 958.[10] Appellant's complaint in the district court only stated that the wheeling provision was itself unreasonable. (R. 13), but made no factual allegations to support its conclusory statement. The 36 months notice requirement to recover surplus capacity is reasonable in that construction activities are planned at least that far in advance in the electrical industry. For example, *see* Idaho Power Co. v. Chapman, *supra* at 7. Thus, a judgment on the pleadings was appropriate and an evidentiary hearing was not required.[11]

IV. *Fifth Amendment Deprivation of Property Without Due Process of Law.*

The appellant next argues that the wheeling provision constitutes a taking of its property without due process in violation of the Fifth Amendment. We cannot agree with appellant on this point. Utah Power fails to consider the fact that the right-of-way statute allows the holder of the grant to place transmission lines on public lands. The right to grant such rights-of-way is within the discretion of the Secretary under 43 U.S.C. § 961, and allowing a private utility to use the public lands balances against allowing the Government to use the holder's surplus capacity.

The regulation would not operate to take property of appellant without just compensation in violation of the Fifth Amendment, because 43 C.F.R. 2851.1–1(a)(5)(h) requires the Department to pay the owner "an equitable share" of the cost of transmission facilities used by the Department. As far as provision for a hearing, the regulations provide under subparagraph (j) for a board of three persons to determine the existence or amount of surplus capacity if the Department and the holder are unable to agree. (This would seem to satisfy due process requirements given the special

---

10. The wheeling requirement in *Idaho Power* required:

"that petitioner make available to the Government on a reasonable cost basis, all surplus transmission capacity within the primary lines of the project, and, upon appropriate request and at least one year's notice, increase the transmission capacity of the project transmission lines at Government's expense. Under the license conditions, the Government's wheeling is limited to 'such amounts as will not unreasonably interfere with the Licensee's use of said lines,' and to transmission 'only to consuming facilities of the United States and to public bodies and co-opera-

tives entitled to statutory preference in connection with the distribution and sale of electric energy, by the United States.'" 346 F.2d at 958.

11. The appellant only challenges the wheeling regulation on its face: it does not contend that the secretary abused his discretion by requiring wheeling under the particular facts and circumstances disclosed in this action. Consequently, this court need not decide the issue of whether the requirement of wheeling over an entire transmission line, when only a small segment will cross over government land, might amount to an abuse of discretion.

relationship between the Department and the private utility in the grant of the right-of-way to public lands. A full evidentiary hearing is not required in every instance.)

### V.   *Vagueness and Ambiguity*

■ Finally, in response to appellant's various contentions that the wheeling regulation is vague and ambiguous and should be declared unreasonable, we are in agreement with the statement of the Department in Southern California Edison Company, *supra,* in responding to the same claim of unreasonableness:

"... we find appellant's arguments on this ground premature. The regulations serve to articulate certain fundamental legal relations subsisting between the Government and the permittees who place transmission lines on Government lands. The regulations do not purport to be a substitute for the complex, contractual relations that must exist before Government attempts to make use of a permittee's transmission facilities. This is made expressly clear by the reference to 'supplemental agreements' at subparagraph (xii) [(1)] of the stipulation. The permittees may assume that if or when Government contracts to use any surplus capacity of a permittee's transmission lines, the Government will not interfere with and will respect all legal rights and interests of the permittees." 71 I.D. at 414.

Because of what has been said herein, we affirm the order of the district court holding that the wheeling requirement and attendant provisions contained in 43 C.F.R. 2851.1–1(a)(5) constitute a reasonable and lawful exercise of the Secretary of the Interior's administrative discretion and that said regulations are within the scope of authority delegated to the Secretary under Title 43, United States Code, Section 961.

Affirmed.