**MEIJER, INC., a Michigan Corporation, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

**CONSOLIDATED INDEPENDENT UNION, LOCAL 951, Petitioner,**

v.

**NATIONAL LABOR RELATIONS BOARD, Respondent.**

Nos. 76–1103, 76–1125.

United States Court of Appeals, Sixth Circuit.

Submitted June 10, 1977.

Decided Oct. 20, 1977.

Stephen C. Bransdorfer, Norman E. Jabin, Miller, Johnson, Snell & Cummiskey, Charles C. Hawk, Grand Rapids, Mich., John F. Foley, Vicksburg, Mich., for petitioner.

Elliott Moore, Deputy Associate Gen. Counsel, N.L.R.B., Peter M. Bernstein, Washington, D. C., for respondent.

Before WEICK, EDWARDS and PECK, Circuit Judges.

EDWARDS, Circuit Judge.

Petitioners in these two cases, consolidated for hearing, are Meijer, Inc., a company which operates a chain of super markets and "Thrifty Acres" stores, and the Consolidated Independent Union, which has represented up to this point the nonsupervisory employees in all of said stores. The company corporate headquarters are located in Walker, Michigan, a suburb of Grand Rapids. The Consolidated Independent Union was certified by the National Labor Relations Board as bargaining representative for Meijer's approximately 1,000 employees in 1963 for the "17 retail establishments and [a] warehouse located in Grand Rapids, Michigan, and environs." Since then the company and the union have grown. Nine new stores have been added as "accretions" to the existing bargaining unit. By 1974 Meijer's stores had increased to 25 and spread across Southern Michigan, with a total employment of between 6,000 and 9,000.

In 1974 the store concerned in this dispute opened in Canton Township near Plymouth, Michigan, in the Detroit Metropolitan area. It, too, was treated as an accretion to the general bargaining unit and dues were withheld from the employees for the petitioner, Consolidated Independent Union, Local 951. Shortly thereafter the Retail Store Employees Union, Local 876, Retail Clerks International Association, AFL–CIO, filed a charge with the National Labor Relations Board that "accretion" of the Plymouth store to the existing Meijer, Inc.–Consolidated Independent Union bargaining unit violated the National Labor Relations Act. A complaint was issued and after a hearing the Administrative Law Judge and the Board held that the new store constituted an appropriate separate bargaining unit.

The ALJ and the Board entered the following conclusions of law:

3. By assisting and recognizing the Respondent Union as bargaining representative for its employees at its store in Plymouth, Michigan, by maintaining and enforcing a collective bargaining agreement containing union-security provisions at that facility, thereby encouraging membership in the Respondent Union, the Respondent Company has engaged in, and is continuing to engage in, unfair labor practices within the meaning of Section 8(a)(1), (2) and (3) of the Act.

4. By obtaining recognition as bargaining representative at the Respondent Employer's Plymouth, Michigan, store in the absence of support from an uncoerced majority of the employees in that store in a unit appropriate for purposes of bargaining, and by maintaining and enforcing as to the employees at that facility, a contract containing union-security provisions, thereby causing the Respondent Employer to discriminate against employees in violation of Section 8(a)(3) of the Act, the Respondent Union has engaged in, and is continuing to engage in, unfair labor practices within the meaning of Section 8(b)(1)(A) and (2) of the Act.

The ALJ also recommended, and the Board agreed, that both the employer and the certified union be required to reimburse the employees for dues and initiation fees which had been "unlawfully exacted from them."

## THE ISSUES

The petitioners contend that the Board improperly failed to follow its own prior decisions concerning a companywide Meijer bargaining unit. Petitioners also argue that the Board failed to apply the correct legal standards of this Circuit in finding the single store to be an appropriate bargaining unit. Additionally, and as a separate issue, the union claims that it was error for the Board to order the company and the union jointly and severally to refund dues collected from the Plymouth store employees because the union and the company were act-

ing in good faith reliance upon the existing contract and there was no organizational or representational claim by any union—the Retail Clerks having specifically disclaimed representation.

## THE BOARD'S PRIOR DECISIONS

■ As indicated above, in 1963 the NLRB found that petitioner Meijer's "17 retail establishments and warehouse," all located in Southwestern Michigan in the general Grand Rapids area, constituted an appropriate bargaining unit. At that time the farthest store from the Meijer headquarters in Walker, Michigan (a suburb of Grand Rapids) was in Battle Creek—a distance of 69 miles. In 1966 the Board reaffirmed the appropriateness of this bargaining unit by refusing a petition to recognize a separate bargaining unit for the warehouse.

By 1974, however, Meijer owned 25 stores and had spread its operations clear across the state into Southeastern Michigan. Its employment had increased from approximately 1,000 to over 6,000. Each new store had been "accreted" to the bargaining unit by agreement of the company and the Independent Unions. In the meantime, however, there had been no challenge to (or NLRB review of) the appropriateness of the original 1963 single bargaining unit to encompass the additional 5,000 employees, many of them located in a different industrial area many miles farther from central headquarters than the original group of employees. All of these new employees had simply been required by the company under the terms of its contract to join the Consolidated Independent Union.

We believe that this history allowed (if it did not require) the NLRB to take a fresh look. Material changes in circumstances, as here, may require Board policy changes concerning the bargaining unit. *See John's Bargain Store Corporation*, 16 N.L.R.B. 1519 (1966); *NLRB v. Kostel Corp.*, 440 F.2d 347 (7th Cir. 1971). As to this issue we find no abuse of the Board's discretion. *See* 29 U.S.C. § 159(b) (1970).

## THE PLYMOUTH STORE BARGAINING UNIT

The legal issues concerning the Board's choice of the Plymouth store bargaining unit are argued from the parties' contrasting points of view in relation to five cases decided in this court: *NLRB v. Pinkerton's, Inc.*, 428 F.2d 479 (6th Cir. 1970); *Wayne Oakland Bank v. NLRB*, 462 F.2d 666 (6th Cir. 1972); *Michigan Hospital Service Corp. v. NLRB*, 472 F.2d 293 (6th Cir. 1972); *NLRB v. Wolverine Wide World, Inc.*, 477 F.2d 969 (6th Cir. 1973); *Prudential Ins. Co. of America v. NLRB*, 529 F.2d 66 (6th Cir.), *cert. denied*, 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 799 (1976). *See also NLRB v. Food Employers Council Inc.*, 399 F.2d 501 (9th Cir. 1968); *Sheraton-Kauai Corp. v. NLRB*, 429 F.2d 1352 (9th Cir. 1970).

Petitioners cite and rely upon the *Pinkerton* and *Wayne Oakland Bank* cases in arguing that we should set aside the Board's bargaining unit determination. The Board in turn relies upon the *Michigan Hospital*, the *Wolverine* and the *Prudential* cases for support of its order.

■ The cases reflect that the major considerations in determining an appropriate bargaining unit in relation to a multi-unit company are prior bargaining relationship, distance of the unit from the central office, whether or not employees are interchangeable with other units, the relative autonomy, or lack thereof, of the individual unit, and the extent to which the management of the individual unit can and must deal with the day-to-day issues of the bargaining relationship.

The hearing of this case before the ALJ resulted in the following findings of fact which were directly related to the local autonomy issue. They were entered largely on the credited testimony of the manager of the store in question and were subsequently accepted by the Board:

With respect to local store autonomy, the record revealed that the stores are separately evaluated by central management as to profitability and performance, and that store managers have indepen-

dent authority to (1) hire new employees, (2) discharge probationary employees, (3) release seasonal employees, (4) discipline employees by way of oral and written reprimands, (5) determine their own work schedule, (6) suspend employees of Meijer's and of the lease departments for serious infractions during working hours such as intoxication or rudeness to customers, pending disposition by the central office, (7) rehire laid off guards on the basis of company need and his estimate of their abilities, without regard to seniority, (8) direct involuntary overtime work in conjunction with the department managers, and are generally in charge of the day-to-day operation of their stores. In addition to the foregoing, Plymouth Store Manager Hildreth testified that he was generally responsible for the hire of the great majority of the employees for his new facility. He also had recommended two of the three line managers for their jobs, had made recommendations for the placement of department managers in his store, all of whom transferred in from other stores, independently designates one of the line managers or the security manager to serve as closing manager. Hildreth further testified that if he planned to be away from the store for less than 1-day, he would independently appoint his replacement. In instances of more prolonged absences and in anticipation of his vacation periods, he would make a recommendation to District Manager Krampe as to who should serve as acting store manager until his return. Krampe would then make the decision. Hildreth has also recommended approximately 30 wage increases for management personnel, all but five or six of which were approved. He also has made recommendations as to the hire of management trainees whom he had initially interviewed and that he had effectively recommended the departmental placement of one of the three management trainees in the Plymouth store. Hildreth also averred that, in practice, he has delayed or modified the administration of the Respondent Employer's above noted policy of progressive discipline without reaction from the central office. With regard to intra-store transfer requests, Hildreth has made recommendations to the relevant line and department managers and the department managers finally decide the same with Hildreth's advice. Hildreth believes that probationary periods for employees have been extended by his store line managers upon his advice, but could not recall individual instances. He also could reduce the labor budgets in his store by scheduling fewer working hours, as long as his store functioned properly.

Similarly at the store level, department managers approve employee breaks, prepare employee interview and change of status reports, release employees for reasons of illness or for personal needs, record the reprimands they administer, schedule the vacations of employees in their departments on the basis of the centrally computed entitlement as set forth in the computer printout. As noted, with the store manager's approval, they may designate employees to work overtime on a mandatory basis. Department managers also arrange the work schedules of the employees in their department. Courtesy desks at the various stores, including Plymouth, are authorized to deal with customer complaints and to cash their checks.
(Footnotes omitted.)

These findings are supported by substantial evidence when we consider this record as a whole. *Universal Camera Corp. v. NLRB*, 340 U.S. 474, 71 S.Ct. 456, 95 L.Ed. 456 (1951). Reviewing the facts as the Board did, there is ample local autonomy to give effectiveness to a separate bargaining unit.

The store in question is a large one—at the time of this hearing it had 164 full-time and 310 part-time employees eligible for the bargaining unit. In this respect the Meijer's bargaining unit found by the Board is more obviously capable of independent function than the much smaller bargaining units rejected by this court in the *Pinkerton* and *Wayne Oakland Bank* cases.

Similarly, there is a strong contrast between the distance between unit and home office involved in this case and the distances involved in the *Wayne Oakland Bank* and *Pinkerton* cases. Of additional significance in the Board's determination of the bargaining unit is the fact found by the ALJ and adopted by the Board that this store is in a different labor market from that in which the original Meijer's bargaining unit is located.

On these two aspects of the bargaining unit decision, the ALJ (and the Board by adoption) said:

Accretion has not been found to be appropriate with respect to facilities physically removed from the larger group as they tend to serve different trade areas with separate economic and marketing considerations.

\* \* \* \* \* \*

The General Counsel and Charging Party also indicate the geographic separation of the Plymouth store from other stores in the chain, as the first Meijer facility in the Detroit metropolitan area. The record revealed that the Plymouth store is about 155 miles from the central office. The nearest Meijer store to the Plymouth facilities, at Ypsilanti, is approximately 18 miles away. The next nearest facility is about 49 miles distant, while three stores are within a range of 64 to 69 miles from Plymouth. Approximately 18 of the Respondent Employer's remaining stores are from 110 to 188 miles from the Plymouth store.

These facts also are supported by the record taken as a whole. And yet, as we see the matter, none of the facts recited above necessarily compel the bargaining unit decision made by the Board in this case. There are factors which favor one bargaining unit. Although interchangeability of employees with the original group of stores in the Grand Rapids area would obviously pose difficulties, interchangeability with the Ypsilanti store is easily possible. It is also true that Meijer, Inc.'s policy was to maintain a strong central control on labor policy. And into the bargain, there was a history of a company-union bargaining relationship which extended back to 1963.

## THE BOARD'S DISCRETION

■ It is, however, no part of the responsibility of this court to determine that the Board made the best possible bargaining unit determination in this case or that the companywide unit contended for by the petitioners would have been legally impermissible if it had been found appropriate by the Board.

Clearly from the company's point of view, dealing with one union has many possible administrative advantages. The Independent Union's interest in increasing the membership and in having no competing union organizing Meijer's employees is equally obvious. Unfortunately for a simplistic answer to this case, these interests may clash with the strongly expressed policy in the Act of allowing employees to be represented by representatives of their own choosing. In such a situation the policy choice is clearly one for the Board to make.

In Section 9(b) of the National Labor Relations Act, Congress provided:

Determination of bargaining unit
by Board

(b) The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof . . . .
29 U.S.C. § 159(b) (1970).

In *Michigan Hospital Service Corp. v. NLRB*, this court said:

The Board may certainly consider the interests of an integrated multi-unit employer in maintaining enterprise-wide labor relations [*see Continental Ins. Co. v. N.L.R.B.*, *supra*, 409 F.2d at 727, 728 (2d Cir.), *cert. denied*, 396 U.S. 902, 90 S.Ct. 215, 24 L.Ed.2d 178 (1969)], but not at the expense of the employees' interest in the "fullest freedom in exercising [their] rights." 29 U.S.C. § 159(b).

"The short answer is simply that the overriding policy of the Act is in favor of the interest in employees to be represented by a representative of their own choosing for purposes of collective bargaining, and the Board was entitled to give this interest greater weight than that accorded to the employer in bargaining with the largest, and presumably most convenient possible unit." *N.L.R.B. v. Western & Southern Life Ins. Co., supra,* 391 F.2d 119, 123 (3d Cir.) [*cert. denied,* 393 U.S. 978, 89 S.Ct. 445, 21 L.Ed.2d 439 (1968)]. *Michigan Hospital Service Corp. v. NLRB,* 472 F.2d 293, 296 (6th Cir. 1972).

The Supreme Court has frequently emphasized the discretion Congress gave the Board in bargaining unit determinations:

The issue as to what unit is appropriate for bargaining is one for which no absolute rule of law is laid down by statute, and none should be by decision. It involves of necessity a large measure of informed discretion, and the decision of the Board, if not final, is rarely to be disturbed. While we do not say that a determination of a unit of representation cannot be so unreasonable and arbitrary as to exceed the Board's power, we are clear that the decision in question does not do so. That settled, our power is at an end.

*Packard Motor Car Co. v. NLRB,* 330 U.S. 485, 491–92, 67 S.Ct. 789, 799, 91 L.Ed. 1040 (1947).

Much more recently the Supreme Court has reiterated this same principle:

Since the selection of an appropriate bargaining unit lies largely within the discretion of the Board, whose decision, "if not final, is rarely to be disturbed," *Packard Motor Co. v. NLRB,* 330 U.S. 485, 491 [67 S.Ct. 789, 91 L.Ed. 1040] (1947), we think the function of the Court of Appeals ended when the Board's error on the "employer" issue was "laid bare." *FPC v. Idaho Power Co.,* 344 U.S. 17, 20 [73 S.Ct. 85, 97 L.Ed. 15] (1952).

*South Prairie Construction Co. v. Local 627, Operating Engineers,* 425 U.S. 800, 805–06, 96 S.Ct. 1842, 1844, 48 L.Ed.2d 382 (1976).

Our conclusion on the bargaining unit issue presented by this case is that the Board's decision is not so "unreasonable and arbitrary as to exceed the Board's power." *Packard Motor Car Co. v. NLRB, supra,* 330 U.S. at 491, 67 S.Ct. at 793.

## THE DUES REIMBURSEMENT ISSUE

■ As to the last issue presented in this appeal, we can be more succinct. Both the Consolidated Independent Union and Meijer, Inc. protest the order of the Board requiring that the dues checked off from the employees' pay at the Plymouth store and paid to the union be returned to them. On this issue the ALJ and the Board found:

In early November, 1974, shortly before the opening of the Plymouth store, newly hired employees were required to attend a series of orientation meetings at the Plymouth store. At these meetings, each employee was given a *New Employee Personnel Kit* containing, *inter alia,* an Employee Handbook, which, in addition to summarizing the Respondent Employee's history, policies and benefits, informed employees that upon completion of their 30-day probationary period, they "will become a member of" CIU. The personnel kit also contained a CIU business envelope containing an application for membership in CIU, a dues checkoff authorization and an enclosure entitled, *Why You Should Join and Be Members of Consolidated Independent, Union Local 951.* This document, listing the benefits available through negotiated contracts and CIU membership, also informed employees that membership has been made a condition of employment under all CIU contracts, with dues to become payable upon completion of the 30-day probationary period. During the orientation meetings, Store Manager Hildreth introduced various company officials, including Fred Meijer, company president, and CIU officials, who, respectively, addressed the new employees.

It is undisputed that since the opening of the Plymouth store, the collective-bar-

gaining agreement between the Respondents has been fully implemented and that the Union security provisions therein have been enforced as to all regular full-time and part-time employees who have completed their 30-day probationary period. Accordingly, dues and initiation fees have been withheld from the pay of Plymouth store employees. It is likewise undisputed that the recognition afforded CIU and the effectuation of the Respondent's collective-bargaining agreement was not preceded by or based upon a submission of authorization cards signed on behalf of the CIU by Plymouth store employees.

(Footnotes omitted.)

These facts, which are supported by the whole record, reflect clearly that no free choice of bargaining agent by employees preceded the check-off. The record also shows that the charging party's complaint in this case was filed shortly after the opening of the store, thus placing both company and union on notice that the dues check-off was subject to dispute.[1] Even if the party's conduct was in good faith, if it was violative of applicable law, remedial action is appropriate. *NLRB v. Bardahl Oil Co.*, 399 F.2d 365, 369–70 (8th Cir. 1968).

The rights which are at issue here are those of the employees. *See Retail Clerks Local 770 v. NLRB*, 370 F.2d 205, 208 (9th Cir. 1966).

Enforcement of the Board's order is granted.

WEICK, Circuit Judge, dissenting.

The action by the Board in splitting off the bargaining unit for employees in Meijer's new store located at Plymouth, Michigan, from the bargaining unit for all of its employees in the entire remaining twenty-four stores in Meijer's chain (which stores are scattered along the southern half of Michigan's lower peninsula, all within a radius of 146 miles from Meijer's headquarters in Grand Rapids) was improper and in my opinion constituted a gross abuse of discretion. The employees of all twenty-five stores at the time were represented by Local 951 Consolidated Independent Union, including the employees of the store at Plymouth, by accretion. This new store at Plymouth was located only eighteen miles from one of Meijer's stores at Ypsilanti; Plymouth is located one mile closer to Grand Rapids than is Ypsilanti's location.

The havoc which the Board's decision will wreak upon Meijer if Meijer is required to bargain and deal with the conflicting claims and demands of two competing and rival labor unions, one union representing employees in a single store and the other union representing the employees in the remaining twenty-four stores of Meijer's integrated chain, is not difficult to imagine.

The Board's decision is inconsistent with the principle of exclusive representation, which underlies not only the policy of the National Labor Relations Act but also the Railway Labor Act, and which principle is a central element in the Congressional structuring of industrial relations. This principle was well stated by Mr. Justice Stewart, who wrote the opinion for the Court in *Abood v. Detroit Bd. Educ.*, 431 U.S. 209, 97 S.Ct. 1782, 52 L.Ed.2d 261 (No. 75–1153, decided May 23, 1977):

> The principle of exclusive union representation, which underlies the National Labor Relations Act[14] as well as the Rail-
>
> [14] Title 29 U.S.C. § 151 *et seq.*
>
> way Labor Act, is a central element in the congressional structuring of industrial relations. *E. g., Emporium Capwell Co. v. Western Addition Community Organization*, 420 U.S. 50, 62–63 [95 S.Ct. 977, 43 L.Ed.2d 12]; *NLRB v. Allis-Chalmers Mfg. Co.*, 388 U.S. 175, 180 [87 S.Ct. 2001, 18 L.Ed.2d 1123]; *Medo Corp. v. NLRB*, 321 U.S. 678, 684–685 [64 S.Ct. 830, 88 L.Ed. 1007]; *Virginia Ry. Co. v. System Federation No. 40*, 300 U.S. 515, 545–549 [57 S.Ct. 592, 81 L.Ed. 789]. The designation of a single representative avoids the confusion that would result

1. Petitioners' equitable arguments would, of course, be considerably stronger if there had been no protest until well after the commencement of dues deductions.

from attempting to enforce two or more agreements specifying different terms and conditions of employment. It prevents inter-union rivalries from creating dissension within the work force and eliminating the advantages to the employee of collectivization. It also frees the employer from the possibility of facing conflicting demands from different unions, and permits the employer and a single union to reach agreements and settlements that are not subject to attack from rival labor organizations. See generally *Emporium Capwell Co. v. Western Addition Community Organization, supra* [420 U.S.] at 67–70 [95 S.Ct. 977]; S.Rep. No. 573, 74th Cong., 1st Sess., 13 (1935).

The Board's decision unnecessarily creates the potential for labor unrest and conflict, and piecemeal unionization for a single employer. It conflicts with prior decisions of the Board, one of which decisions involved Meijer Supermarkets, Inc. and Retail Clerks Local 20, and conflicts also with prior decisions of not only this Court but also of other Circuits as well. It practically destroys the doctrine of accretion which is common in all chain store operations. The proprietor of the chain ought not to be compelled to have a separate bargaining unit every time he opens a new store, particularly when such new store is located within the radius of his other stores.

In 1963 Local 20 of the Retail Clerks Union, as well as its International Association, sought a separate bargaining unit for a new Meijer-Thrifty Acres store which Local 20 contended was a new operation distinct from its supermarkets. The Board reviewed the operations of Meijer, rejecting the contention of Local 20, and stated in *Meijer Supermarkets, Inc.*, 142 NLRB 513, 515–16 (1963):

> Despite these differences, the evidence establishes that operations at all of the Employer's stores are controlled through a central office which plans, coordinates, and directs management policies relative to merchandising practices, pricing, personnel administration, purchasing, and inventory control. The central office also has sole authority to determine the basic layout of the store, the type and variety of the merchandise carried, overall staffing, hours of operation, and major promotional and advertising activities. All stores are serviced by central warehouse and bookkeeping facilities. Intermediate supervision is effected through an operations director and district manager, whose responsibilities are defined by division of the stores into two supervisory districts, each containing both Meijer and Thrifty stores. The operations director and district manager work out of the central office and attempt to visit each store in their respective districts at least once every 2 weeks. The store managers have immediate responsibility for the execution of directives handed down by the central office.

> Moreover, there are other important features common to both Thrifty and Meijer stores. The record shows that: There is no difference in the authority of the store managers at Thrifty and Meijer locations; gross revenues from the sale of food items exceed those from nonfood lines at each of the Employer's stores; merchandise available at all stores is jointly advertised; that all stores are of the self-service, discount variety; the Employer's private labels are carried in all stores; and both merchandise and personnel are interchanged between Meijer and Thrifty stores.

> With the exception of the nonfood classifications covered by the supplement agreement, all employees derive their hourly rates from the basic bargaining agreement. In addition, all employees are covered by a common grievance system, and enjoy all other contractual nonwage benefits. The basic agreement also provides for the exercise of departmental seniority on a companywide basis without differentiating between Thrifty and Meijer stores. Despite the different work responsibilities of certain nonfood employees at the Thrifty stores, the overall skill and experience required of employees at these stores is substantially similar to that possessed by their counterparts at the Meijer Supermarkets.

On the basis of the foregoing, we are of the opinion that the Employer's Thrifty Acres operations represent no more than a normal business expansion of existing facilities and not the establishment of an entirely new operation. Accordingly, and in view of the bargaining history, community of employment interests throughout the chain, high level of centralized management and control, minimal store autonomy, geographic integration, employee interchange, and the absence of any indication that the organizational interests of employees would be impaired if a chainwide unit were found appropriate; we find a unit consisting of employees at all 17 stores and the warehouse to be appropriate herein.

To say the least, Meijer's chain was well integrated with employees having a community of interests.

At the time of the Board's decision in *Meijer Supermarkets*, Meijer had seventeen retail establishments and a warehouse at Grand Rapids. Since the decision Meijer has acquired eight new stores and another warehouse. There is not an iota of proof that Meijer's mode of operation has been different since the Board's 1963 decision. The conflict between the two decisions is clear. The only substantial difference pointed out by the Board was the fact that Meijer now has eight more stores and more employees. It is submitted that this is a distinction without a difference, and is immaterial.

In 1966 the Regional Director for NLRB's Seventh Division, noting the Board's 1963 decision, rejected an attempt by a Teamster Local to sever the Meijer warehouse, located at Walker, Michigan, a suburb of Grand Rapids, from the rest of the bargaining unit.

A stable bargaining relationship has existed between Meijer and Local 951 Consolidated Independent Union continuously since 1951 when the company's employees were first organized. During the years following there have been nine collective bargaining agreements, two contract amendments, one contract supplement, and eight wage reopeners. In reaching its decision the Board did not properly evaluate this important relationship.

Another matter not properly taken into account by the Board is the effect of its decision on employee interchange. When the Plymouth store opened in November, 1974, sixty-one employees from other Meijer stores transferred there. During a period of fifteen months, in 1974 and early 1975, ninety-five employees transferred to the Ypsilanti store from other Meijer stores. This could not have been accomplished if there were separate bargaining units in the stores.

It should be noted that Local 876 Retail Store Employees Union, the charging party in the present case, is a sister-Local of Local 20 which filed the unfair labor practice charge in 1963 that the Board rejected.

Prior to the opening of the new store at Plymouth, namely on November 18, 1974, Local 876 advised Meijer by letter that it "does not make any recognition claims and disclaims doing so." Shortly thereafter, however, Local 876 changed its mind and filed unfair labor practice charges, not only against Meijer but also against Local 951 Consolidated Independent Union. The Board made no finding that Local 876 Retail Clerks represented any of Meijer's employees in the Plymouth store; nor was any effort made by Local 876 to organize the employees of the twenty-four remaining stores of Meijer. This would have been a very difficult undertaking in view of the satisfactory manner in which Local 951 has represented the employees. It was much easier for the Retail Clerks Union to split off a single store.[1]

As noted by the Board in its 1963 decision, such factors as the control by the central office over wages, fringe benefits, layoffs, recall, job bidding, and administra-

---

1. The Retail Clerks Union could have made an attempt to organize all of Meijer's stores in 1975 when Local 951's collective bargaining agreement with Meijer expired. It did not do so; it obviously preferred the split off.

tion of the grievance procedure, as well as its overall co-ordination of the company's labor policies, point toward a centrally-controlled labor policy. The Board did not properly weigh these factors in the present case. Further, the Board has failed to show any difference between the store manager's minimal autonomy on labor relations in 1963 and that in 1974. This Court, in *NLRB v. Pinkerton's Inc.*, 428 F.2d 479, 484 (6th Cir. 1970), observed:

> Where labor policy is centrally determined, and where a manager of a local unit does not have authority to decide questions of collective bargaining, such a local unit does not constitute an appropriate bargaining unit.

*See also NLRB v. Solis Theatre Corp.*, 403 F.2d 381, 383 (2d Cir. 1968).

In *Pinkerton's, Inc.* we followed the decision of the First Circuit in *NLRB v. Purity Food Stores, Inc.*, 376 F.2d 497 (1st Cir. 1967). In that case the Court rejected the attempt of Local 1435 Retail Clerks International, sustained by the Board, to organize the employees of only one of the employer's chain of seven stores.

In *Wayne Oakland Bank v. NLRB*, 462 F.2d 666, 667 (6th Cir. 1972), we stated:

> The Courts have found that the important factors entering into the determination of such a unit are; First, the extent of the centralized control of the commercial and administrative aspects of the business and, Second, the extent of centralized control of labor policy. This second factor involves consideration of where matters subject to collective bargaining, such as wage and fringe benefits, are determined, i. e., whether the responsibility resides in the main office or with the branch supervisor.

*Accord* on the second factor: *NLRB v. Pinkerton's, Inc., supra* at 484.

A third factor to be weighed is the extent of employee interchange between company stores. *Wayne Oakland Bank v. NLRB, supra* at 667.

In the present case there is no evidence that the store managers for Meijer had any more autonomy in 1974 than they had in 1963. In fact the record suggests no change in the centralization of the company's administration and commercial aspects of the business.

During the four years prior to the filing of the unfair labor practice charges, the company's labor relations department at its headquarters office determined company labor policies. Nonetheless, the local store manager could issue written reprimands, suspend employees, and could represent the company at the first two steps of the grievance procedure, but all according to company policy. The store manager was required to consult with the labor relations department before the completion of the second step of the grievance procedure. Further, the store manager selected his replacement to close the store if he was gone less than one day. The Meijer store manager, as in most retail store chains, had a hand in determining the schedule of an employee's work hours and vacation time; he could even order an employee to work overtime. In recent years, however, computerization of the employees' work and vacation schedules has lessened the store manager's role on work schedules. The store manager also had authority to discharge non-bargaining unit non-supervisory employees, to layoff and recall non-Local 951 security guards, and to hire part-time workers within the guidelines set down by the district manager. In the present case the Plymouth store manager even had a hand in the hiring of many of the employees at the Plymouth store. Yet such autonomy in a store manager as hiring authority is not sufficient to justify a separate store bargaining unit. *See NLRB v. Davis Cafeteria, Inc.*, 396 F.2d 18, 20 (5th Cir. 1968); *NLRB v. Frisch's Big Boy Ill-Mar, Inc.*, 356 F.2d 895, 897 (7th Cir. 1966).

The decision of the Board not only conflicts with its own decision in 1963, involving Meijer, but it conflicts also with our decisions in *Pinkerton's, Inc.* and *Wayne Oakland Bank, supra.*

In accreting the new store at Plymouth to the other twenty-four stores for collec-

tive bargaining purposes, Meijer and the union relied on the 1963 decision of the Board. Not only did the Board in effect overturn its 1963 decision, but it also imposed a penalty upon Meijer, as well as upon the union, in its so-called remedial order when it ordered both the company and the union to reimburse the employees, who have received the benefits of unionization for the past three years, the amount of their dues and initiation fees with interest.

The Board's remedial orders ought to be applicable to the circumstances of each case, should not be oppressive, and should effectuate the policies of the Act. *NLRB v. Seven-Up Bottling Co.*, 344 U.S. 344, 349, 73 S.Ct. 287, 97 L.Ed. 377 (1953).

Here, the company and the union accreted the Plymouth store employees into the multistore bargaining unit in good faith, based on their successful accretion of other new employees at the other new company stores and based on the decision of the Board in 1963 and the decision of the Seventh Region's Regional Director in 1966, both of which decisions favored a multistore bargaining unit. Such conduct, guided by the Board's own past blessings, hardly warranted the Board's harsh reimbursement remedy order. *NLRB v. Masters-Lake Success, Inc.*, 287 F.2d 35, 36 (2d Cir. 1961). *Cf. Intalco Aluminum Corp. v. NLRB*, 417 F.2d 36, 40–43 (9th Cir. 1969).

The crux of this case was the Board's failure to analyze properly and to evaluate all the factors which determined the appropriate bargaining unit for the Plymouth store employees, and to give due recognition to its previous 1963 ruling and to the decisions of our Court. Accordingly, enforcement of the Board's order should be denied.