885 F.2d 341
 132 L.R.R.M. (BNA) 2734, 58 USLW 2288,
112 Lab.Cas. P 11,452
 NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
CATHERINE McAULEY HEALTH CENTER, doing business as Mercy
Health Building, a division of Sisters of Mercy
Health Corporation, Respondent.
 No. 88-5455.
 United States Court of Appeals,
Sixth Circuit.
 Argued Feb. 14, 1989.
Decided Sept. 20, 1989.
 
 Aileen A. Armstrong, Deputy Associate Gen. Counsel, Peter Winkler, Charles P. Donnelly, Jr., William M. Bernstein (argued), N.L.R.B., Office of the General Counsel, Washington, D.C., for petitioner.
 A. David Mikesell (argued), Honigman, Miller, Schwartz & Cohn, Detroit, Mich., for respondent.
 Before GUY and NORRIS, Circuit Judges; and BELL, District Judge.*
 ALAN E. NORRIS, Circuit Judge.
 
 
 1
 The National Labor Relations Board petitions for enforcement of its order finding the employer in violation of Sections 8(a)(1) and (5) of the National Labor Relations Act, 29 U.S.C. Secs. 158(a)(1) and (5), for refusal to bargain. We must determine whether the Board properly invoked its "single-facility presumption" in a bargaining unit scope determination regarding some employees located in one building of a hospital complex. Because we believe that a factual predicate for application of the presumption, geographical separation, is not present, and that under the traditional "community of interests" standard the evidence does not support the Board's finding, we deny enforcement.
 
 I.
 
 2
 Catherine McAuley Health Center, a division of Sisters of Mercy Health Corporation, d/b/a Mercywood Health Building ("McAuley"), has for many years maintained health care facilities providing inpatient and outpatient medical services in the Ann Arbor, Michigan area. The main facility is located on Huron River Drive, where McAuley operates, among other services, a hospital, a drug rehabilitation facility, an inpatient ambulatory care center, a building housing offices and a motel, an urgent care facility, an education center, and a child care facility. Prior to 1986, McAuley also operated Mercywood Hospital ("Mercywood"), a mental health facility, at a separate location eighteen miles from the main facility.
 
 
 3
 This dispute arose from the relocation of Mercywood to the Huron River Drive location, and the relocation's effect on union representation of certain employees of Mercywood. In 1979, McAuley established a single governance board to consolidate management of the two facilities. The board determined that the mental health facility should be moved to the Huron River Drive location. Consequently, in 1983, McAuley began construction of a new building at the main facility.
 
 
 4
 In 1984, Local 79, Service Employees International Union, AFL-CIO ("the union"), filed a petition to represent the service and maintenance employees at Mercywood, which was still located at its original site. On November 2, 1984, the union, upon receiving a majority of votes in a representation election, was certified as the collective bargaining representative for employees in the following unit at Mercywood:
 
 
 5
 All full-time and regular part-time environmental aids, linen aids, discharge cleaning aids, environment specialists, lead aids, wall washers, food service workers, dishwashers, cooks I, cooks II, head cooks, psychiatric aids, maintenance employees, groundskeepers, drivers, maintenance utility workers, lead groundskeeper, mechanic boiler relief employees, painters, coordinator preventive maintenance employees, construction coordinators, recreational therapy aids, occupational therapy aids, and unit information clerks, employed by Mercywood Hospital, but excluding all office clerical employees, casual employees, guards and supervisors as defined in the Act, and all other employees.
 
 
 6
 A one-year collective bargaining agreement, effective between November 7, 1985 and November 7, 1986, was negotiated. The parties appended to the collective bargaining agreement a "Letter of Agreement," which stated that the collective bargaining agreement "shall be applicable at a new location in the event Mercywood Hospital is moved to another location to the extent required by law." (Emphasis added.)
 
 
 7
 On August 19, 1986, union business agent Michele Fecteau and union attorney Michael Haggerty met with McAuley's Director of Employee Relations, Dorothy Brown, and McAuley attorney David Mikesell to discuss Mercywood's move. The union requested specific information regarding Mercywood's move and its effect upon the employees. Mikesell and Brown indicated that the move of employees would be "en masse" and that McAuley intended to respect the collective bargaining agreement at the new facility.
 
 
 8
 On October 6, McAuley received the union's demands for a new collective bargaining agreement. Four days later, Mikesell met with Fecteau and another union representative. Mikesell informed them that negotiations could be fruitless because the separate Mercywood bargaining unit might cease to exist if the move was considered a merger, but nonetheless agreed to meet for bargaining.
 
 
 9
 Before the parties could meet for negotiations, McAuley moved the Mercywood operations to its main location according to schedule, on October 25, 1986. A letter was distributed to all Mercywood employees advising them that Mercywood's move completed McAuley's integration of its physical and mental health programs and that McAuley had "decided that it is no longer appropriate to continue to recognize a separate bargaining unit for Mercywood employees. We have, therefore, notified the [union] that we no longer recognize them as representing the eighty-nine employees in the former Mercywood bargaining unit." Mikesell sent Fecteau a letter to this effect. McAuley's representative failed to appear for negotiation sessions scheduled for November 5 and 6, and the collective bargaining agreement expired by its terms on November 7.
 
 
 10
 The record reflects that, following the relocation, McAuley's staff consisted of approximately 2,700 employees, divisible into four distinct groups: 475 supervisory and management employees; 1,500 professional licensed employees, including registered nurses, medical technologists and physical therapists; 300 clerical employees, and 400 service and maintenance employees, including environmental aides, food service employees, psychiatric aides, unit assistants, physical medical aids, surgical aids, and engineering and maintenance employees. According to the Board's estimation, somewhere between forty-eight and ninety-eight of the service and maintenance employees work at the Mercywood building. By and large, the service and maintenance group at the new Mercywood facility and that of the old facility consist of the same persons. There occurred some interchange, however, as Mercywood's food service employees, maintenance employees, and groundskeepers were incorporated into McAuley's central departments. The terms and conditions of the Mercywood service and maintenance workers' employment showed no significant change after the relocation, but it is uncontradicted that the nature and content of these employees' jobs, as well as their management, wages and benefits, are substantially the same as that of employees in other buildings.
 
 
 11
 On November 12, a charge was filed by the union alleging that McAuley had engaged in unfair labor practices. A hearing was held before an administrative law judge on March 11 and 12, 1987.
 
 
 12
 The A.L.J. determined that the vast majority of Mercywood employees experienced little change in their daily work in terms of nature of work, supervision, hours and rate of pay. The A.L.J. therefore concluded that the move did not amount to an integration but rather constituted merely a relocation of the mental health operations. Relying upon Central Soya Co., 281 N.L.R.B. No. 173, 124 L.R.R.M. 1026 (1986), a case involving a relocation of grain operations to a newly purchased facility and a consolidation of the work forces resulting in an accretion of the employees at the new facility into an already union-represented work force, the A.L.J. held that the facts in this case did not warrant a finding of accretion, and therefore the certified unit remained the appropriate unit. The A.L.J. concluded that McAuley continued to have an obligation to bargain with the union under the Act.
 
 
 13
 The Board affirmed the A.L.J.'s decision, although it relied upon a different analysis. Stating that the case presented no issues of bargaining unit accretion, the Board instead treated the A.L.J.'s determination as a unit scope decision in the health care context. The Board relied on Manor Healthcare Corp., 285 N.L.R.B. No. 31, 125 L.R.R.M. 1333 (1987), which applied a "single-facility presumption" to an employer in the health care field which operated more than one facility. The Board held that McAuley had not rebutted the presumption that a bargaining unit limited to the employees at Mercywood was appropriate and, therefore, McAuley had violated Secs. 8(a)(5) and (1) of the Act. The Board now petitions for enforcement of its order.
 
 II.
 
 14
 McAuley contends that the Board erred in its determination that a unit limited to the service and maintenance employees at Mercywood is an appropriate unit, despite the fact that the mental health facility has been relocated to the Huron River Drive location.
 
 
 15
 Because of its experience and expertise, and in light of the need to shape a bargaining unit to the facts of a particular case, the Board is given broad authority to determine a "unit appropriate" "for the purposes of collective bargaining." 29 U.S.C. Sec. 159(a). Wide, though not unbridled, discretion is vested in the Board by virtue of language found in Sec. 9(b) of the National Labor Relations Act, 29 U.S.C. Sec. 159(b):
 
 
 16
 The Board shall decide in each case whether, in order to assure to employees the fullest freedom in exercising the rights guaranteed by this subchapter, the unit appropriate for the purposes of collective bargaining shall be the employer unit, craft unit, plant unit, or subdivision thereof[.]
 
 
 17
 However, the Board's discretion in unit determinations is not without constraints, and if the Board's bargaining unit determination "oversteps the law," it must be reversed. Allied Chemical & Alkali Workers v. Pittsburgh Plate Glass Co., 404 U.S. 157, 92 S.Ct. 383, 30 L.Ed.2d 341 (1971). Indeed, several limitations on the Board's authority are found in the Act itself. First, the Board's discretion is limited by the statutory requirement that the Board "assure to employees the fullest freedom in exercising the rights guaranteed" by the National Labor Relations Act. Indianapolis Glove Co. v. NLRB, 400 F.2d 363, 368 (6th Cir.1968). In Indianapolis Glove, this court read the statutory phrase to prohibit the Board from disregarding judicially developed objective factors in favor of the Board's own speculation concerning the bargaining goals of the employees. A further statutory constraint is placed on the Board by Sec. 9(c)(5), 29 U.S.C. Sec. 159(c)(5), which provides that "[i]n determining whether a unit is appropriate for the purposes specified in subsection (b) of this section the extent to which the employees have organized shall not be controlling." In addition to explicit statutory limitations, a bargaining unit determination by the Board must effectuate the Act's policy of efficient collective bargaining. In this regard, the scope of judicial review of a unit determination is limited to ensuring that the Board's exercise of its authority is not so arbitrary or capricious, or so unsupported by evidence, as to amount to an abuse of discretion. Prudential Ins. Co. v. NLRB, 529 F.2d 66, 67 (6th Cir.), cert. denied, 425 U.S. 975, 96 S.Ct. 2176, 48 L.Ed.2d 799 (1976); Wayne Oakland Bank v. NLRB, 462 F.2d 666, 667 (6th Cir.1972).
 
 
 18
 Traditionally, in making unit determinations, the Board has adhered to a "community of interests" test: two groups must share a community of interests in wages, hours, and other conditions of employment sufficient to justify their mutual inclusion in a single bargaining unit. Armco, Inc. v. NLRB, 832 F.2d 357, 362 (6th Cir.1987), cert. denied, --- U.S. ----, 108 S.Ct. 2034, 100 L.Ed.2d 619 (1988). Although the test is not capable of precise definition, several factors can be enumerated as indicia of a community of interests:
 
 
 19
 This test consists of several factors: (1) similarity in skills, interests, duties, and working conditions; (2) functional integration of the plant, including interchange and contact among the employees; (3) the employer's organizational and supervisory structure; (4) the bargaining history; and, (5) the extent of union organization among the employees. "Employee desires," an additional factor frequently included in other circuits, is not a relevant factor in this circuit.
 
 
 20
 Armco, 832 F.2d at 362 (citations omitted).
 
 
 21
 General guidelines concerning application of the community of interests test may be drawn from past decisions of the Board and the courts. The primary concern or "touchstone" of a bargaining unit determination is the question of whether all the members have a mutual interest in wages, hours, and other terms and conditions of employment. See Uyeda v. Brooks, 365 F.2d 326, 329 (6th Cir.1966). This key factor assumes special prominence in any bargaining unit determination. The Board recently has placed heightened emphasis on the employer's organizational and supervisory structure in determining the scope of an appropriate unit. See C. Morris, The Developing Labor Law 201 (2d ed. Supp.1988). In particular, centralized control of day-to-day labor relations in areas of importance to employees may indicate an integrated operation where a broader unit may be appropriate. B. Siegel Co. v. NLRB, 670 F.2d 64 (6th Cir.1982) (enforcing Board's determination that single-store bargaining units were appropriate where matters of daily importance to employees were left to the store managers). An additional and important principle of application arises from the statutory mandate that controlling weight is not to be given to prior bargaining history.
 
 
 22
 Bargaining unit determinations in the health care context require that attention be given to several other considerations. Non-profit health care institutions were excluded from the operation of the National Labor Relations Act in its original form. However, in 1974, Congress amended the Act to cover employers in this area. The decision to extend the Act was made in light of two contrasting concerns: (1) the perceived need for the grant of rights guaranteed by the Act to non-profit hospital employees whose working conditions and pay had become substandard; and (2) the simultaneous provision of adequate safeguards to protect the public against disruption of health care services due to labor disputes. Long Island Jewish-Hillside Medical Center v. NLRB, 685 F.2d 29, 32 (2d Cir.1982). Although relevant statutory provisions were not altered to accommodate the special considerations of this context, both the House and Senate Committee Reports contained an admonition relevant to bargaining unit determinations regarding employees in health care institutions:
 
 EFFECT ON EXISTING LAW
 Bargaining Units
 
 23
 Due consideration should be given by the Board to preventing proliferation of bargaining units in the health care industry. In this connection, the committee notes with approval the recent Board decisions in Four Seasons Nursing Center, 208 NLRB No. 50, 85 LRRM 1093 (1974), and Woodland Park Hospital, 205 NLRB No. 144, 84 LRRM 1075 (1973), as well as the trend toward broader units enunciated in Extendicare of West Virginia, 203 NLRB No. 170, 83 LRRM 1242 (1973).
 
 
 24
 S.Rep. No. 766, 93d Cong., 2d Sess. 5 (1974); H.R.Rep. No. 1051, 93d Cong., 2d Sess. 6-7 (1974), U.S.Code Cong. & Admin.News 1974, pp. 3946, 3950 (footnote omitted).
 
 
 25
 The significance of this congressional admonition upon the analysis of what constitutes an appropriate bargaining unit in the health care context is the subject of protracted debate. For instance, courts have disagreed whether the traditional community of interests test is adequate to address Congress' concerns, or whether the admonition mandates a stricter "disparity of interests" analysis. Compare International Bhd. of Elec. Workers Local 474 v. NLRB, 814 F.2d 697, 709-15 (D.C.Cir.1987), with Southwest Community Health Servs. v. NLRB, 726 F.2d 611, 613 (10th Cir.1984). In addition, it is unsettled whether the Board may continue to rely upon the "single-facility presumption" in this context, or whether application of the presumption is improper in that it leads to unwarranted unit fragmentation. See Presbyterian/St. Luke's Medical Center v. NLRB, 653 F.2d 450 (10th Cir.1981); Long Island Jewish-Hillside Medical Center, supra. However, delineating the precise effect of the congressional admonition is not necessary to the resolution of the enforceability of the order before us. It is, of course, apparent that regardless of the particular import accorded the admonition, giving consideration to the prevention of undue proliferation of units inherently favors the employer. Because we conclude that the Board's unit determination cannot be supported even under the community of interests test, the most rigorous standard applied in this context from the viewpoint of the employer, we need not address whether the Board has adequately accommodated the admonition in its analysis.
 
 
 26
 A bargaining unit must be appropriate in both scope and composition. Thus, there have arisen separate bodies of case law addressing the questions of unit scope, i.e., the extent to which the unit will encompass separate facilities of a single employer or several employers, and unit composition, i.e., the types of employees to be included in a bargaining unit. In this case, we are both confronted with a unit scope determination and asked to review the continuing appropriateness of a bargaining unit found appropriate when Mercywood was still maintained as a separate facility. In a variety of contexts, the Board has, when asked to consider certification of a unit confined to one plant or facility of an employer engaged in multi-plant or multi-facility operations, relied upon a "single-facility presumption." This presumption, as stated in the oft-cited decision in Dixie Belle Mills, Inc., 139 N.L.R.B. No. 61, 51 L.R.R.M. 1344, 1345 (1962), recognizes the appropriateness of a bargaining unit limited to a discrete group of employees:
 
 
 27
 A single plant unit, being one of the unit types listed in the statute as appropriate for bargaining purposes, is presumptively appropriate. Therefore, unless such plant unit has been so effectively merged into a more comprehensive unit by a bargaining history, or is so integrated with another as to negate its identity, it is an appropriate unit even though another unit, if requested, might also be appropriate. Moreover, even assuming that the unit urged by the Employer and found by the Regional Director here may be the most appropriate unit, this does not establish it as the only appropriate one.
 
 
 28
 This single-facility presumption has been applied by the Board in making unit determinations in the health care industry. For example, in Manor Healthcare Corp., 285 N.L.R.B. No. 31, 125 L.R.R.M. 1333 (1987), the Board applied the presumption in this context, saying "a single-facility unit geographically separated from other facilities operated by the same employer is presumptively appropriate for the purpose of collective bargaining, even though a broader unit might also be appropriate." Id. at 1335.
 
 
 29
 The presumption is rebuttable, and a variety of factors have traditionally been considered in determining whether the presumption has been overcome: (1) the degree of autonomy of the individual facility; (2) centralization of control of the day-to-day operations of the individual unit; (3) geographic proximity of the various facilities; (4) extent of employee interaction between various facilities; and (5) prior bargaining history. See Meijer, Inc. v. NLRB, 564 F.2d 737, 740 (6th Cir.1977); Presbyterian/St. Luke's Med. Center, 653 F.2d at 454.
 
 III.
 
 30
 McAuley argues that application of the single-facility presumption in this case was inappropriate, as Mercywood, following the move to the Huron River Drive location, ceased to be a separate "facility." The Board contends that the presumption was correctly applied, as an appropriate unit was certified before Mercywood was relocated, and McAuley has not rebutted the continuing appropriateness of the unit.
 
 
 31
 A manifest precondition to application of the single-facility presumption is a finding that the single unit is separated from other facilities of the employer. The separation, moreover, must be geographical as well as physical. As the Board pointed out in Manor Healthcare, the underlying premise of the presumption is that a facility can be considered a distinct entity because it is "geographically separated" from other facilities. It logically follows then, as previously noted, that evidence of geographical proximity may be utilized to rebut the presumption. Geographical proximity or distance are relevant considerations because the interval separating facilities may have a bearing on whether employees in one facility share a community of interests with employees in others. Accordingly, the theoretical underpinning for the presumption disappears where the facility at issue is not geographically separated.
 
 
 32
 In NLRB v. Pinkerton's, Inc., 428 F.2d 479 (6th Cir.1970), this court reviewed a determination by the Board that thirty-one guards in the Mansfield, Ohio area constituted an appropriate bargaining unit, on the basis that these employees "comprise[d] a cohesive grouping with interests, separate and apart from employees in other areas." Id. at 484. The employer asserted that the bargaining unit should have been composed of all 480 guards in the Columbus district, which included parts of Ohio, Kentucky, and West Virginia. The Pinkerton's court denied enforcement of the Board's order, concluding that a review of the record disclosed that the employer had rebutted the single-facility presumption. Id.
 
 
 33
 In the course of its discussion of the appropriateness of a unit limited to one operation of a multi-facility employer, the opinion notes that the single-facility presumption was developed and first applied to industrial enterprises operating several plants, and was subsequently extended to retail chain operations. See id. at 483 (quoting Weiss Markets, Inc., 142 N.L.R.B. 708, 710, 53 L.R.R.M. 1141 (1963)). Contrasting the security guard business, the court found a degree of permanency and independence present with respect to chain stores and plants that was lacking in the security guard context. As a historical note, then, it is instructive that the presumption originated with respect to operations far more geographically dispersed and independent than a separate building on a hospital complex. The opinion in Pinkerton's enumerates "certain controlling principles" that could be gleaned from the authorities upon which it relied. Among these was included the principle that
 
 
 34
 [w]here only a few miles of physical separation exist between parts of an organization, with no consequent division of substantial ministerial responsibilities, the fact that there is no division of such ministerial responsibilities is enough to justify the conclusion that one of these parts of the organization is not an appropriate bargaining agent.
 
 
 35
 Id. at 484. This court, then, has assumed that, as a factual predicate to the application of the single-facility presumption, the facility at issue must be geographically separated from other facilities of the employer.
 
 
 36
 In adopting the presumption, we take it that the Board was saying that its experience almost invariably has been that when an employer maintains a facility which is distanced geographically from its other facilities, employees in that facility, due to their isolation from other employees, will develop a cohesiveness and community of interests sufficiently independent of the other employees that it is appropriate that these employees form their own bargaining unit. It is proof of the fact of geographical isolation that makes probable the inferred fact of a community of interests. In the absence of that separation, it is not sensible to assume a community of interests, because there is not present the known fact with which a community of interests is usually connected. In short, without that underlying known fact, there can be no presumed fact.
 
 
 37
 Accordingly, the single-facility presumption has no application under the circumstances of this case, where certain operations of the hospital were relocated to a separate building at the health care complex or campus. Certainly, if the mental health operations of Mercywood had been relocated to a wing of a large, multi-unit building, there would be no dispute that all the operations of the employer were contained in one "facility," and the presumption could not be invoked. How then can the presumption be any more valid where those operations are housed in a neighboring building? While the single-facility presumption may aid analysis in other circumstances such as operation of a retail store chain, where the employer's facilities by their nature must be geographically separate, it has little relevance where, as here, the operations could just as easily be housed in a separate wing as in a separate building. There is no practical distinction between operating Mercywood in a wing and operating it in a free-standing building which would justify different treatment in defining bargaining units.
 
 
 38
 The Board, then, was not entitled to rely upon the single-facility presumption.
 
 IV.
 
 39
 Without the assistance of the single-facility presumption, it is apparent that there is simply too little evidence to support a determination that a separate bargaining unit comprised of the service and maintenance employees at Mercywood is proper under the community of interests standard. An analysis of relevant factors demonstrates the similarity of conditions and concerns that exist between these employees and others employed at the complex. Therefore, the unit that at one time may have been an appropriate unit, ceased to be a unit appropriate for the purposes of collective bargaining following the relocation of the mental health center.
 
 
 40
 At the hearing before the A.L.J., McAuley adduced copious evidence of the commonalities and cohesiveness present with respect to all employees at the health center, including evidence that all employees shared a common wage and benefit structure; that other conditions of employment, such as a grievance procedure and a counseling service, were offered to all who work at McAuley; that it is uncontested that McAuley had a highly integrated management structure and centralized labor policies, including common hiring procedures, work rules, disciplinary policies and labor relations; and that some interchange of employees did take place. In view of this overwhelming evidence indicating the inappropriateness of a bargaining unit limited to the service and maintenance employees at Mercywood, we conclude that, under the traditional community of interests analysis, the proposed unit was not an appropriate bargaining unit under 29 U.S.C. Sec. 159.
 
 V.
 
 41
 For the reasons set forth above, we DENY ENFORCEMENT of the order of the Board.
 
 
 42
 GUY, Circuit Judge, concurring.
 
 
 43
 Although I concur in the result reached by the court, I write separately to convey my view that even if we found the single facility presumption applicable in this instance, the Catherine McAuley Health Center (CMHC) garnered sufficient rebuttal evidence to overcome the presumption. As the court notes, among factors pertinent to rebuttal of the single facility presumption are: the degree to which there is autonomy of the individual facility, employee interchange among facilities, bargaining history in a different unit, geographic proximity of the facilities, the presence of a union seeking to represent the employees in a larger unit, functional integration of operations, and centralization of management, particularly regarding personnel and labor relation matters. Presbyterian/St. Lukes Medical Center v. NLRB, 653 F.2d 450, 454 (10th Cir.1981). See also Meijer, Inc. v. NLRB, 564 F.2d 737, 740 (6th Cir.1977). I would find rebuttal in this case based on the combination of geographic proximity of the facilities, employee interchange among facilities, and functional integration of operations and centralization of management, vis-a-vis, personnel and labor relations matters.
 
 
 44
 The geographic proximity of the Mercywood facility to the rest of the McAuley campus needs little discussion except to note that the ALJ and Board expressly gave this factor little weight in view of their perceived absence of employee interchange following the relocation. On the issue of employee interchange, however, CMHC demonstrated that subsequent to the relocation of Mercywood, it employed approximately 2,700 employees, of which 400 were service and maintenance employees. Although the Board estimated that somewhere between 48 and 98 of the service and maintenance employees work in the Mercywood building, only approximately 50 of the former bargaining unit employees continue to work there. Although neither the Board nor CMHC offered a concrete breakdown, approximately 48 former bargaining unit employees (cooks, groundskeepers, and maintenance employees) have been integrated either into the CMHC campus workforce or the centralized engineering department. The ALJ explicitly acknowledged these and other post-Mercywood relocation changes, including the move of the partial hospitalization program to the new Mercywood facility from an off-campus location and the attainment of anticipated reductions in operating costs, improved efficiency, and centralized employee management. I would find that the transfer and integration of nearly fifty percent of the bargaining unit employees into centralized campus departments constitutes more than the mere administrative change they were characterized as by the ALJ. Rather, the transfer and integration indicate that employee interchange did occur in tandem with the Mercywood relocation.
 
 
 45
 Finally, as the court notes, the nature and content of the Mercywood service and maintenance workers' jobs, including their management, wages, and benefits are substantially the same as that of CMHC employees in the other campus buildings. Moreover, employment conditions such as grievance procedures and counseling services are available to all CMHC employees. CMHC maintains a highly integrated management structure and centralized labor policies, including common hiring procedures, work rules, disciplinary policies, and labor relations.
 
 
 46
 In my view, the ALJ and Board erred in finding that CMHC did not succeed in rebutting the single facility presumption because that finding was premised on a finding of a lack of employee interchange that is not supported by substantial evidence. I recognize that CMHC's case for rebuttal is not based on a demonstration that every factor considered dictated rebuttal. The list of factors pertinent to rebuttal, however, is not exclusive. See Presbyterian/St. Lukes Medical Center, 653 F.2d 450, 454. On balance, therefore, considering the geographic proximity of the facilities, the extent of employee interchange, and the extent of integrated and centralized management governing work conditions and other labor issues, I would find that CMHC successfully rebutted the single facility presumption.
 
 
 
 *
 The Honorable Robert Holmes Bell, United States District Judge for the Western District of Michigan, sitting by designation