**NATIONAL LABOR RELATIONS BOARD, Petitioner,**

v.

**DMR CORP. and Harrill Electric Contractors, Inc., Respondents.**

No. 85–4287.

United States Court of Appeals, Fifth Circuit.

July 28, 1986.

Rehearing and Rehearing En Banc Denied Aug. 28, 1986.

John F. Welsh, Elliott Moore, Deputy Assoc. Gen. Counsel, N.L.R.B., Washington, D.C., for petitioner.

Laura M. Franze, Ronald M. Gaswirth, Dallas, Tex., for respondents.

Louis V. Baldovin, Jr., Director, Region 23, N.L.R.B., Houston, Tex., for other interested parties.

Before GOLDBERG, HILL and JONES, Circuit Judges.

GOLDBERG, Circuit Judge:

This case involves an electrical contractor's attempt to avoid its legal obligations to its union employees by setting up a non-union shop fifteen minutes down the road. It comes to us a second time on the application of the National Labor Relations Board for enforcement of its order entered against Harrill Electrical Contractors, Inc. (Harrill) and DMR Corporation (DMR). The Board found that Harrill and DMR, as a single employer, violated Sections 8(a)(1) and (5) of the National Labor Relations Act (NLRA), 29 U.S.C. §§ 158(a)(1) and (5), by refusing to apply the terms of Harrill's collective bargaining agreements with Locals 59 and 116 of the International Brotherhood of Electrical Workers (the unions) to electricians who were employed by DMR, and by refusing to recognize Locals 59 and 116 as the bargaining representatives of those employees.

Upon the Board's first trip before this court, we upheld the Board's finding that Harrill and DMR constituted a single employer. *NLRB v. DMR Corp.*, 699 F.2d 788, 791 (5th Cir.), *reh'g and reh'g en banc den.*, 706 F.2d 315, *cert. den.*, 464 U.S. 852, 104 S.Ct. 164, 78 L.Ed.2d 150 (1983). We concluded, however, that the record provided insufficient facts to allow us properly to review the Board's finding that the employees of DMR and Harrill constitute an appropriate bargaining unit. We therefore remanded the case to the Board "for the limited purpose of a new hearing, and new findings and conclusions on the sole issue of the appropriateness *vel non*, of the single bargaining unit of Harrill's and DMR's electricians." *Id.* at 793. With the additional facts adduced at this second hearing before us,[1] we now enforce the Board's order.

## FACTUAL BACKGROUND

The facts found during the first hearing before the Board are set out in the prior opinion, 699 F.2d at 789–90, and in the Board's order, 258 NLRB 1063 (1981). The Administrative Law Judge (ALJ) found, the Board concurred, and this court agreed, that Respondents' status as a single employer

is revealed, among other things, by husband and wife, together, owning 80 percent of the shares of both, the remaining shares of both being held in identical proportions by Rawlinson and Walters; by husband being the nominal head of one and wife of the other, with Anita [the wife] plainly being no more than a figurehead; by husband and wife comprising one-half of the board of directors of one, and two-thirds of the other; by the informality of the loan arrangements between the two entities because they were so "closely-held"; by the identical nature of their business activities; by the dovetailing of Harrill Electric's business

[1.] Harrill and DMR ("Respondents") initially assert that the prior panel's remand to the Board did not contemplate a new evidentiary hearing and that the Board therefore lacked authority to reopen the record. In the face of the prior opinion's plain language, it is difficult to conceive of a more frivolous argument, and we therefore reject it. Respondents also contend that the prior panel lacked authority to remand the case for its stated purpose. Whatever the merits of respondents' argument, we make no attempt to consider it, as the prior panel's conclusion is the law of the case.

decline with DMR's genesis and business buildup, with DMR seemingly inheriting Harrill Electric's role *vis-a-vis* at least two major customers, McCarty Corporation and Honeywell; by the switch of three-fourths of Harrill Electric's management team—Eavenson, Walters, and Rawlinson—to DMR, where each assumed the approximate role occupied with Harrill Electric; by Randy's [the husband's] being a moving force in the creation of DMR; by Randy's obvious part in the switch of Harrill Electric employees to DMR, his reassigning Ralston from DMR's Denton job to one in Fort Worth, and his concern about the security of DMR's copper wire; by the substantial transfer of Harrill Electric equipment to DMR, albeit under color of sale; by Walters being compensated, during his first 2 or 3 weeks with DMR, by vacation pay accrued with Harrill Electric; by the manifest union-avoidance purpose behind the decline of Harrill Electric and the emergence of DMR, which is suggestive of a ruse; and by the appallingly vague, evasive, self-contradicting, and mutually conflicting testimony of Respondents' witnesses, which not only suggests, but also reveals with virtual conclusivity a form-but-not substance contrivance.

*DMR Corp.*, 258 NLRB at 1068.

Six witnesses testified during the hearing on remand.[2] Two witnesses, Joe Gilmore and Alan Head, had been electricians for Harrill before the emergence of DMR. Three witnesses, Mark Penney, Amos Pollard, and James Ralston, were electricians carried over from Harrill to DMR. The sixth witness, Kenneth Tuggle, was among the first electricians hired by DMR and had never worked for Harrill previously.

The testimony addressed almost exclusively the prior panel's concern that the record contained "little, if any, evidence concerning the work, skills, qualifications,

duties and working conditions of the Harrill and DMR electricians." 699 F.2d at 792. As to skills and qualifications, all witnesses were licensed by the City of Dallas as journeyman wiremen. Those witnesses who had worked for both Harrill and DMR testified that their supervisors at DMR did not require of them any greater skills than were required of them at Harrill. All witnesses testified that assignments with both Harrill and DMR involved a mix of residential and commercial work. There was also a considerable carry-over of on-the-job supervision in foremen Don Watkins and Mike Eavenson. Finally, Ralston testified that, "basically [he] used the same tools for Harrill as [he] did at DMR," and that the manner in which the work was assigned, supervised, and performed was "[b]asically the same." Rec.Vol. 3 at 656–57.

On the basis of this new evidence and the evidence previously developed—"most notably, Randy Harrill's continued active role, the substantial continuity otherwise of top management, and the union avoidance purpose behind the shift from Harrill Electric to DMR",[3] the ALJ reaffirmed his conclusion, paraphrasing *Appalachian Construction, Inc.*, 235 NLRB 685, 686 (1978), that "The only real difference, other than name, between [DMR] working on the project[s] and [Harrill Electric] was the absence of union labor." Rec.Vol. 5 at 697. The Board therefore concluded that "the only appropriate bargaining unit is 'the single bargaining unit of Harrill's and DMR's electricians.'" *Id.* at 737.

## DISCUSSION

### A. *Appropriateness of the Bargaining Unit*

■ The principle question before us is whether the Board's unit determination is correct. "Our power of review is quite

---

**2.** After an attempt to prevent the ALJ from reopening the record failed, counsel for Respondents refused to participate further and left the hearing room. The hearing proceeded without them.

**3.** Opinion of ALJ on Remand, Rec.Vol. 5 at 697.

limited. We are not to overturn the Board's decision unless it is 'arbitrary and capricious.' " *NLRB v. DMR Corp.*, 699 F.2d at 791.

In determining the appropriateness of a bargaining unit, we are concerned with the community of interests of the employees involved. *Peter Kiewit Sons' Co.*, 231 N.L.R.B. 76, 77 (1977). Whether employees have a community of interests is determined by looking at such factors as: similarity in the scale and manner of determining earnings; similarity in employment benefits, hours of work and other terms and conditions of employment; similarity in the kind of work performed; similarity in the qualifications, skills and training of employees; frequency of contact or interchange among employees; geographic proximity; continuity or integration of production processes; common supervision and determination of labor-relations policy; relationship to the administrative organization of the employer; history of collective bargaining; desires of the affected employees; and extent of union organization. R. Gorman, Labor Law: Unionization and Collective Bargaining 69 (1976). *NLRB v. Purnell's Pride, Inc.*, [609 F.2d 1153 (5th Cir.1980) ].

The most reliable indicium of common interests among employees is similarity of their work, skills, qualifications, duties and working conditions. See *Allied Chemical Alkali Workers of America, Local Union 1 v. Pittsburgh Plate Glass Co. v. NLRB*, 404 U.S. 157, 172, 92 S.Ct. 383, 393, 30 L.Ed.2d 341 (1971). Two other reliable indicia of common interests are centralized local control on a day-to-day basis of those labor policies which most immediately affect the interest of the employees involved and common supervision. It is these indicia which ultimately determine whether an employer-wide unit of Harrill and DMR electricians is the appropriate bargaining unit or whether DMR's electricians constitute an appropriate bargaining unit separate from Harrill's employees. *Peter Kiewit Sons' Co., supra.* *Id.* at 791–92.

In assessing the employees' community of interests, "[t]he Board must consider the entire factual situation, and its discretion is not limited by a requirement that its judgment be supported by all, or even most, of the potentially relevant factors." *International Association of Machinists and Aerospace Workers v. NLRB*, 759 F.2d 1477, 1480 (9th Cir.1985). We have noted therefore that "Harmonizing the cases into a uniform pattern is not wholly feasible, because of the factual nature of the determination, the broad discretion in the agency in making one of several acceptable choices, and the limited scope of correctly applied judicial scrutiny." *NLRB v. J.M. Wood Manufacturing Co.*, 466 F.2d 201, 202 (5th Cir.1972), *cert. den.*, 410 U.S. 931, 93 S.Ct. 1372, 35 L.Ed.2d 593 (1973).

The parties have treated this case as one of accretion by a single employer. "An accretion occurs when new employees are added to an already existing [bargaining] unit." *Universal Security Instrument, Inc. v. NLRB*, 649 F.2d 247, 253 (4th Cir.), *cert. den.*, 454 U.S. 965, 102 S.Ct. 506, 70 L.Ed.2d 380 (1981). "A finding of accretion by the Board is similar to the Board's certifying of a particular group of employees as an appropriate bargaining unit because in both the Board is using its expertise to determine the most appropriate mix of employees for a particular unit." *Id.* In this case, the Board seeks to add ("accrete") DMR's employees to the bargaining unit comprised of Harrill's employees and represented by the unions. The community of interests analysis necessary to support an accretion, however, differs somewhat from the Board's more ordinary decision to certify initially a particular group of employees as an appropriate bargaining unit. *NLRB v. Security Columbian Banknote Co.*, 541 F.2d 135, 140 (3rd Cir.1976). In a certification case, "The unit need not be the most appropriate, but only one which is appropriate under the circumstances." *Ochsner*

*Clinic v. NLRB,* 474 F.2d 206, 209 (5th Cir.1973).

By contrast, in an accretion case, "A group of employees is properly accreted to an existing bargaining unit when they have such a close community of interests with the existing unit *that they have no true identity distinct from it.*" *NLRB v. St. Regis Paper Co.,* 674 F.2d 104, 107–08 (1st Cir.1982) (emphasis added); *accord Security Columbian Banknote Co., supra,* 541 F.2d at 140 (accretion proper "when such a community of interest exists among the entire group that the additional employees have no separate unit identity"); *DMR Corp., supra,* 699 F.2d at 792 n. 2 ("The issue is whether the difference [between the work, skills, qualifications, duties and working conditions of Harrill and DMR electricians] is so great as to indicate that DMR's employees constitute an appropriate unit separate from Harrill's employees").[4] Nonetheless, "[t]he Board's finding of accretion is similar to its function of determining the appropriateness of particular units for bargaining purposes.... The determination is one involving the Board's discretion and should not be set aside unless a reviewing court is convinced that the Board has acted in an arbitrary and capricious manner." *NLRB v. R.L. Sweet Lumber Co.,* 515 F.2d 785, 794 (10th Cir.), *cert. den.,* 423 U.S. 986, 96 S.Ct. 393, 46 L.Ed.2d 302 (1975); *accord NLRB v. Baton Rouge Waterworks Co.,* 417 F.2d 1065, 1067 (5th Cir.1969).

This heightened concern for the interests of the employees to be accreted arises from accretion's interference with the employees' freedom to choose their own bargaining agents. *International Association of Machinists v. NLRB, supra,* 759 F.2d at 1480. Accretion interferes with the employees' freedom to choose because a "determination [of accretion] forecloses a vote and restricts the employees in the exercise of their basic right to select their bargaining representative." *Boire v. International Brotherhood of Teamsters,* 479 F.2d 778, 796–97 (5th Cir.1973) (quoting *Pix Manufacturing Co.,* 181 NLRB 88, 90 (1970)). The Board's special attention to the existence of a distinct and separate community of interests among the employees to be accreted addresses this concern, as a group of employees whose interests are distinct from another group's interests would not necessarily choose the same bargaining representative.

The Board satisfied its evidentiary burden on remand when the evidence showed that "Respondent's electricians performed a mix of the same kinds of commercial and residential work, using much the same skills, during both the Harrill Electric and DMR phases." Rec. at 697. With this finding, the Board could properly conclude

---

4. Respondents argue that in order to prevail in an accretion case the General Counsel "must show that the two groups of employees constitute *the only* appropriate unit [citing *Acoustics, Inc.,* 270 NLRB 1046, 1047 (1984)]. In other words, in order for the General Counsel to prevail, it must be shown that the employees of the nonunion company *standing alone could not constitute an appropriate bargaining unit.*" Respondents' Brief at 9 (emphasis in original). Insofar as this formulation of the accretion test focuses solely on the community of interests of the employees to be accreted to the exclusion of the community of interests of the two groups as a whole, it must be rejected. Were we to accept Respondents' test, any finding of accretion would necessarily contain the seeds of its own destruction, as is apparent from the example below.

Assume two groups of employees: A, the group of non-union employees to be accreted, and P, the pre-existing unit. If accretion is appropriate, the members of the combined group AP by definition share a community of interests. From this finding, however, it also follows that the members of any subset of AP also share a community of interests. Thus, the members of A share a community of interests and could therefore stand alone as an appropriate unit. Under Respondents' formulation, however, this fact would destroy the finding of accretion, because the General Counsel would be unable to show "that the employees of the nonunion company *standing alone could not constitute an appropriate bargaining unit.*" The proper test is therefore not whether group A has a community of interests among its members only, but rather whether the difference between the communities of interests of A and P "is so great as to indicate that [A's] employees constitute an appropriate unit separate from [P's] employees." *DMR Corp., supra,* 699 F.2d at 792 n. 2.

that DMR's employees did not possess a community of interests sufficiently separate and distinct so as to preclude their accretion to the bargaining unit of Harrill's employees. Accordingly, we conclude that the Board's determination that the employees of Harrill and DMR constitute the appropriate bargaining unit is neither arbitrary nor capricious.

The Board's decision is further supported by its finding "that DMR was created in order to avoid dealing with the bargaining representatives of Harrill's employees." *DMR Corp.*, 258 NLRB at 1063 n. 3. This finding weighs heavily in this case, as the Board must, in addition to safeguarding the employees' freedom of choice, act to ensure the stability of labor relations. *International Association of Machinists v. NLRB, supra*, 759 F.2d at 1480.

This finding of union animus distinguishes this case from the "double-breasted" [5] cases relied upon by Respondents in their attack on the Board's order. Where a true "double-breasted" operation exists, the Board has generally refused to find the requisite community of interests. *See, e.g., Peter Kiewit Sons' Co.*, 231 NLRB 76 (1977), *enforcement granted*, 595 F.2d 844 (D.C.Cir.1979). Here, the Board expressly distinguished *Peter Kiewit* by finding that Respondents did not constitute a double-breasted operation: "two companies *operating in different economic climates*, one union and one nonunion." *DMR Corp.*, 258 NLRB at 1069 (emphasis in original) (quoting *Appalachian Construction, Inc.*, 235 NLRB 685, 686 (1978)). Given DMR's succession to Harrill contracts, and the coincidence of Harrill's decline with DMR's rise, we cannot conclude that the Board's finding is arbitrary and capricious.

**B.   *Relief***

■ To remedy Respondents' violations of the NLRA, the Board ordered Harrill and DMR to cease and desist from the unfair labor practices found; to recognize and bargain upon request with the unions as the bargaining representatives of DMR electricians; to make their employees whole for any losses suffered by reason of their failure to honor the collective bargaining agreements with the unions; and to post an appropriate notice.

Respondents claim that the Board erred in ordering make-whole relief. This claim is wholly without merit. Section 10(c) of the NLRA, 29 U.S.C. § 160(c), accords the Board broad discretion in fashioning remedies for unfair labor practices. The remedial power of the Board is "a broad discretionary one, subject to limited judicial review." *Fibreboard Paper Products Corp. v. NLRB*, 379 U.S. 203, 216, 85 S.Ct. 398, 406, 13 L.Ed.2d 233 (1964). The Board's order must not be disturbed "unless it can be shown that the order is a patent attempt to achieve ends other than those which can fairly be said to effectuate the policies of the Act." *Virginia Electric & Power Co. v. NLRB*, 319 U.S. 533, 540, 63 S.Ct. 1214, 1218, 87 L.Ed. 1568 (1942).

Respondents have failed to make this showing. The Board may properly prevent the Respondents from gaining an advantage by their unlawful conduct. An order requiring that the employees be made whole for the unlawful repudiation of a collective bargaining agreement serves this end. *NLRB v. R.H. Rutter-Rex Manufacturing Co.*, 396 U.S. 258, 263, 90 S.Ct. 417, 420, 24 L.Ed.2d 405 (1969); *NLRB v. Gissel Packing Co., Inc.*, 395 U.S. 575, 612, 89 S.Ct. 1918, 1939, 23 L.Ed.2d 547 (1969). As

---

**5.** We noted in *Florida Marble Polishers Health and Welfare Trust Fund v. Edwin M. Green, Inc.* that

In general, double breasted units are formed in order to allow a contractor to compete for union and nonunion work. For example, a subcontractor may wish to operate one corporation that employs union workers and which, therefore, can bid for work from general contractors who let contracts only to

unionized subcontractors. Simultaneously, the subcontractor may operate a nonunionized corporation which will bid on jobs let by general contractors who do not require unionized subcontractors.

653 F.2d 972, 976 n. 7 (5th Cir.1981), *cert. den.*, 456 U.S. 973, 102 S.Ct. 2235, 72 L.Ed.2d 846 (1982). However, the contractor may not, under cover of an alleged double-breasted operation, avoid its union shop obligations.

we stated in *NLRB v. George E. Light Boat Storage, Inc.*, 373 F.2d 762, 768 (5th Cir.1967).

> [a] simple order to bargain in good faith would not be sufficient. To allow an employer unlawfully to repudiate a collective bargaining agreement at the small cost of being required, sometime in the future, to sit down and bargain with the union would encourage such violations of the Act. For the period from the breach until a new agreement, if any, is reached pursuant to the Board's bargaining order, the employer would be at liberty to disregard the terms of the contract. The temptation to violate the Act in a situation where the employer would have everything to gain and nothing to lose could be overwhelming.

Similarly, mere prospective application of the contracts would permit the Company to reap an unjust advantage from its unlawful conduct and would not adequately redress the employees' losses.[6] The Board's order, "which deprives an employer of advantages accruing from a particular method of subverting the Act, is a permissible method of effectuating the statutory policy." *Virginia Electric & Power Co., supra,* 319 U.S. at 541, 63 S.Ct. at 1219. We therefore enforce it.

## CONCLUSION

A prior panel of this court held that Respondents are a single employer. We now uphold the Board's finding that Respondents' employees constitute an appropriate bargaining unit. Together, these two findings trigger Respondents' liability under the NLRA for their actions in this case. Our laws protect the labor-management relation from the insidious acts here proved just as surely as they protect that relation from overt violence. At long last, the Board can now begin the process of providing Respondents' employees with the material relief to which they are entitled by virtue of Respondents' patently unlawful activities. To borrow from the Biblical injunction: what the Board hath joined together let not the employer rend asunder. The Order of the Board is

ENFORCED.

---

**6.** Respondents' suggestion that no DMR employees suffered harm from Respondents' refusal to apply the contracts is an issue properly reserved for the compliance stage of this proceeding.