953 F.2d 1384
 142 L.R.R.M. (BNA) 2312
 NOTICE: Sixth Circuit Rule 24(c) states that citation of unpublished dispositions is disfavored except for establishing res judicata, estoppel, or the law of the case and requires service of copies of cited unpublished dispositions of the Sixth Circuit.
IRVIN H. WHITEHOUSE & SONS COMPANY, INC., Plaintiff-Appellant,
v.
LOCAL UNION NO. 118 OF the INTERNATIONAL BROTHERHOOD OF
PAINTERS AND ALLIED TRADES, AFL-CIO, Defendant-Appellee,
and
General Drivers, Warehousemen and Helpers, Local Union No.
89; National Labor Relations Board, Intervening
Defendants-Appellees.
NATIONAL LABOR RELATIONS BOARD, Petitioner,
v.
IRVIN H. WHITEHOUSE & SONS COMPANY, INC., Respondent.
 Nos. 91-5307, 91-5867.
 United States Court of Appeals, Sixth Circuit.
 Feb. 5, 1992.
 
 On Appeal from the United States District Court for the Western District of Kentucky, No. 90-00143; Johnstone, D.J.
 On Application for Enforcement of an Order of the National Labor Relations Board, No. 9-CA-27701.
 W.D.Ky.
 AFFIRMED, ORDER ENFORCED.
 Before RYAN and BOGGS, Circuit Judges, and HOOD, District Judge.*
 PER CURIAM.
 
 
 1
 This case involves nine employees of Irvin H. Whitehouse & Sons Company. Whitehouse and the International Brotherhood of Painters contend that the employees in question are part of a bargaining unit represented by the Painters. The Teamsters and the National Labor Relations Board argue that they constitute a separate bargaining unit represented by the Teamsters. Because the NLRB has legitimately used its power to determine appropriate bargaining units, we grant its application and enforce its order against Whitehouse. Because the NLRB has exclusive jurisdiction over disputes of this kind, we also affirm the district court's decision to dismiss a suit brought by Whitehouse involving these same facts.
 
 I.
 
 2
 Whitehouse applies commercial and industrial paint and performs related services at various locations throughout the United States. It maintains a central paint shop in Louisville, Kentucky, consisting of three buildings located on a three-acre site, where various equipment is stored, cleaned, and repaired. When Whitehouse employees begin a new job, necessary equipment is transported to the jobsite in a trailer; the trailer then becomes a jobsite shop for storing, cleaning, and repairing equipment. After the job is finished, the trailer is returned to the Louisville facility.
 
 
 3
 As a member of the Louisville Chapter of the Painting and Decorating Contractors of America, Whitehouse has recognized Local Union 118 of the International Brotherhood of Painters and Allied Trades, AFL-CIO, as the official bargaining agent of its non-management employees for almost fifty years. A series of collective bargaining agreements between the Contractors and the Painters union has governed this relationship, and requires that disputes arising under the agreement be presented to a Joint Trade Board, composed of representatives from the Painters and the Contractors, for resolution. When the series of agreements began, Whitehouse had only one employee in its Louisville paint shop; as he was too old to enter the apprentice program, he was not represented by the Painters. However, Whitehouse began hiring additional paint shop employees in the 1970's, and by January 1990 it employed nine shop workers. None of these employees paid union dues, voted for a union representative, or had official ties to the Painters.
 
 
 4
 The particular agreement between the Contractors and the Painters at issue in this case covered the period between July 23, 1987 and July 22, 1990. It created a new job classification, that of "utility worker," and thereafter Whitehouse began hiring utility workers for its field jobs. However, prior to January 1990, neither Whitehouse nor the Painters recognized the paint shop employees as utility workers, or treated them as being covered by the bargaining agreement. On January 8, 1990, General Drivers, Warehousemen and Helpers Local Union No. 89, affiliated with the International Brotherhood of Teamsters, Chauffeurs, Warehousemen and Helpers of America, AFL-CIO, filed a representation petition with the National Labor Relations Board seeking to represent the nine paint shop employees. On January 25, Whitehouse responded by filing a unit clarification petition with the NLRB in which it sought to have the shop employees added directly to the Painters as an "accretion." On January 26, the NLRB's Regional Director ordered the cases consolidated and directed a hearing; the Painters intervened in this proceeding.
 
 
 5
 While the NLRB proceedings were pending, the Painters filed a grievance with the Joint Trade Board, accusing Whitehouse of breaching its agreement by assigning to non-union employees work that should have been done by the Painters. Specifically, the Painters claimed the paint shop employees as union members. On February 6, 1990, the Joint Trade Board found that the paint shop employees were covered by the "utility worker" classification of the agreement. On February 28, Whitehouse filed an action in federal district court seeking enforcement of the Joint Trade Board's decision under the Federal Arbitration Act. The Painters admitted all allegations in their answer, and the district court entered a judgment confirming the decision on April 9. However, neither the NLRB nor the Teamsters were aware of the district court proceedings. Furthermore, when the judgment was entered, the district court did not know that other parties were interested in the action.
 
 
 6
 Meanwhile, on January 29, 1990, the NLRB held a hearing in the representation cases. On April 9--the same day that the district court entered judgment for Whitehouse--the Regional Director found that Whitehouse's employees were not covered by the agreement's "utility worker" provision, and that the agreement did not bar an election. He also concluded that the paint shop employees constituted a separate bargaining unit from Whitehouse's other employees, and directed an election to permit the shop employees to vote on whether they wanted to join the Teamsters. Whitehouse sought a review of this decision, but on May 9, the NLRB denied the request for review. On May 22, the Teamsters won a secret ballot election among the paint shop employees; the Regional Director subsequently certified the Teamsters as the exclusive representative of the shop employees.
 
 
 7
 On April 27, 1990, the Teamsters filed a motion to intervene in the district court proceeding. The district court granted this motion on May 10 and stayed its April 9 judgment. On June 26, the NLRB filed motions to intervene, set aside the judgment, and dismiss the complaint. On January 29, 1991, the district court concluded that the dispute turned on the appropriate unit for representation, and held that it lacked the jurisdiction to determine such an issue. The district court also determined that the NLRB's ruling took precedence over the decision of the Joint Trade Board, and dismissed the action with prejudice. Whitehouse brought this timely appeal.
 
 
 8
 Shortly thereafter, on July 5, 1990, the Teamsters attempted to bargain with Whitehouse, but were refused. The Teamsters then filed a charge of unfair labor practice and, on August 17, the NLRB's General Counsel alleged that Whitehouse's refusal to bargain violated the National Labor Relations Act, 29 U.S.C. §§ 158(a)(5) and (1). Whitehouse responded that the NLRB's certification of the Teamsters was invalid. On October 19, the NLRB issued a decision and order granting the General Counsel's motion for summary judgment. It concluded that Whitehouse had given no good reason for it to reexamine its representation decision. Consequently, it determined that Whitehouse had violated the law by refusing to bargain with the Teamsters, the legally recognized union. The NLRB ordered Whitehouse to cease and desist from refusing to bargain with the Teamsters and from denying its employees any of their legal rights; it also required Whitehouse to bargain with the Teamsters upon request. The NLRB then applied to this court to enforce its order, under 29 U.S.C. 160(e), and on August 9, 1991, its petition was consolidated with Whitehouse's appeal from the district court.
 
 II
 
 9
 We shall first address the NLRB's application for enforcement of its order. Section 9(b) of the National Labor Relations Act allows the NLRB to determine "the unit appropriate for the purposes of collective bargaining." 29 U.S.C. § 159(b). To determine whether two groups of employees belong in the same bargaining unit, the NLRB applies a "community of interest test," which includes the following factors:
 
 
 10
 (1) similarity in skills, interests, duties, and working conditions; (2) functional integration of the plant, including interchange and contact among the employees; (3) the employer's organizational and supervisory structure; (4) the bargaining history; and, (5) the extent of union organization among the employees.
 
 
 11
 Armco. Inc. v. NLRB, 832 F.2d 357, 362 (6th Cir.1987), cert. denied, 486 U.S. 1042 (1988). "The Board's unit determination is conclusive if it is not 'so unreasonable and arbitrary as to exceed the Board's power.' " L.M. Berry and Co. v. NLRB, 668 F.2d 249, 251 (6th Cir.1982) (quoting Meijer, Inc. v. NLRB, 564 F.2d 737, 743 (6th Cir.1977)). See also South Prairie Constr. Co. v. Local 627. Int'l Union of Operating Eng'rs, 425 U.S. 800, 805 (1976).
 
 
 12
 One option for the NLRB in making unit decisions is to clarify an existing unit by adding employees as an "accretion," meaning that they would be added to the unit directly, without voting in a representation election. Penn Traffic Co. v. NLRB, 546 F.2d 677 (6th Cir.1976). Because accretions limit employees' ability to choose their own representatives, " 'the accretion doctrine should be applied restrictively.' " International Ass'n of Machinists v. NLRB, 759 F.2d 1477, 1480 (9th Cir.1985) (quoting NLRB v. Sunset House, 415 F.2d 545, 547 (9th Cir.1969)). Thus, accretions are rarely appropriate. " 'A group of employees is properly accreted to an existing bargaining unit when they have such a close community of interests with the existing unit that they have no true identity distinct from it, ' " NLRB v. DMR Corp., 795 F.2d 472 (5th Cir.1986) (quoting NLRB v. St. Regis Paper Co., 674 F.2d 104, 107-08 (1st Cir.1982)) (emphasis added by Fifth Circuit). Because it concerns bargaining units, the determination as to accretion is a decision "involving the Board's discretion and should not be set aside unless a reviewing court is convinced that the Board has acted in an arbitrary and capricious manner." NLRB v. R.L. Sweet Lumber Co., 515 F.2d 785, 794 (10th Cir.), cert. denied, 423 U.S. 986 (1975).
 
 
 13
 The NLRB claims that the following distinctions between the shop employees and the field employees justify its decision to treat shop employees as a separate unit. The nine shop employees work primarily at or from the Louisville shop, while field employees work primarily at customer jobsites. See NLRB v. American Seaway Foods, Inc., 702 F.2d 630, 633 (6th Cir.1983) (office clericals worked in main office; plant clericals worked in warehouse). The field employees are primarily supervised by project directors at the jobsites, while the shop employees are primarily supervised by Shop Foreman Odell Sexton, who has much greater authority over shop employees than field employees. In contrast to its usual method, Whitehouse hires permanent shop employees without utilizing the Painters' hiring hall. Shop employees are paid from $5.15 to $7.45 per hour, while utility workers receive $4.60 to $4.80. Shop employees receive company-sponsored insurance benefits; field employees derive benefits from Painters' funds. Unlike field employees, shop employees may participate in a company-sponsored employee stock ownership plan. See Automobile Club of Mich. v. NLRB, 631 F.2d 82, 85 (6th Cir.1980) ("differences in pay scales" justify different units). Shop employees punch time clocks and work from about 6 a.m. to 3 p.m.; field employees keep their time on handwritten cards and work from 7 a.m. to 4 p.m. See Mercy Hosp. of Buffalo v. NLRB, 730 F.2d 75, 81 (2d Cir.1984). The NLRB also argues that shop and field employees have little contact with one another. The parties' dispute over these factual issues is quite involved; we cannot explain their claims in full without replicating the briefs. Nonetheless, sufficient differences exist to demonstrate that the NLRB did not abuse its authority by designating the shop employees a separate bargaining unit.
 
 
 14
 Moreover, neither Whitehouse nor the Painters ever indicated that the shop employees should be union members until the Teamsters filed their petition.
 
 
 15
 Employees may be added by unit clarification where, as in the creation of new job [sic], their existence was unforeseen and they are functionally identical to employee classifications included within the existing unit. Employees cannot be added by unit clarification, however, where they intentionally and historically were excluded from the existing bargaining unit.
 
 
 16
 NLRB v. Mississippi Power & Light Co., 769 F.2d 276, 279 (5th Cir.1985) (emphasis in original); see also Wallace-Murray Corp., 192 NLRB 1090 (1971). In this case, the shop employees' work changed gradually over twenty years, and thus, their existence was not unforeseen when the "utility worker" category was established. Neither Whitehouse nor the Painters considered the shop employees to be covered by their contract until the Teamsters appeared on the scene. Accretion under such circumstances is not appropriate. See also Saints Mary and Elizabeth Hosp. v. NLRB, 808 F.2d 1211, 1212 (6th Cir.1987).
 
 
 17
 Whitehouse attempts to avoid the strict guidelines on accretion by claiming that the NLRB has turned a work jurisdiction issue into a representational issue. It maintains that under the terms of its collective bargaining agreement the only issue involved in cases of this type is whether the work performed by the central paint shop falls within the jurisdiction of the Painters. It makes a similar claim in its appeal from the district court. We reject this argument. For this court to consider this case an honest dispute between Whitehouse and the Painters over the status of these nine employees, we would have to ignore almost all of the relevant facts. For the past twenty years, the shop employees have grown in number and responsibility, yet they were never considered to be union members. Even after the 1987 contract introduced the provision covering utility workers, the shop employees were not treated as union members. Only when the Teamsters attempted to represent the shop employees did the Painters suddenly try to claim them. Thus, the real dispute, and the only dispute, is whether these nine employees will be represented by the Teamsters or the Painters. This is a question of the appropriate bargaining unit, which Congress has refused to leave in the realm of contract interpretation.
 
 
 18
 Whitehouse also attempts to demonstrate that the nine employees in question meet the five parts of the community of interest test. But this issue is not for us to decide. We merely determine whether the NLRB has abused its discretion by certifying a particular unit. See NLRB v. Continental Corp. of Mich., 612 F.2d 257, 259 (6th Cir.1979) ("We do not necessarily believe that the Board acted wisely in approving this bargaining unit. We do believe that it was within the Board's discretion to make the choice it did.").
 
 
 19
 Finally, Whitehouse asserts that the NLRB's decision is defective in this case because it failed to comply with its own rules. Section 11052.1 of the NLRB's Casehandling Manual for representation proceedings provides that the NLRB will defer to the dispute resolution proceedings of the AFL-CIO whenever two or more AFL-CIO affiliates are involved in a representation battle. Since both the Teamsters and the Painters belong to the AFL-CIO, Whitehouse complains that the NLRB violated its own procedures. However, § 11052.1 applies only when one of the unions in the dispute has an "established bargaining relationship" governing the "employees involved." Since the Painters never established such a relationship with the employees in this case, the rule does not apply.
 
 III
 
 20
 Next, we turn to the propriety of the district court's determination that Whitehouse's attempt to enforce the decision of the Joint Trade Board should be dismissed. The district court reasoned that while it has jurisdiction to decide cases involving breaches of collective bargaining agreements, "[i]t does not have jurisdiction to decide the representational status of a bargaining unit." Because the district court concluded that "the dispute centers on the appropriate unit to represent the paint shop employees," it dismissed the case.
 
 
 21
 Whitehouse contends that this dispute is governed by the Federal Arbitration Act, 9 U.S.C. §§ 1 et seq. The Act provides for judicial enforcement of arbitration awards whenever both parties have agreed on arbitration and agreed as to the enforcing court. Whitehouse argues that the district court below violated this provision by refusing to enforce the decision of the Joint Trade Board, and also violated a national policy favoring arbitration. See Southland Corp. v. Keating, 465 U.S. 1, 10-16 (1984).
 
 
 22
 We agree with Whitehouse that arbitration clauses are widely favored in the law. We also recognize that district courts have general jurisdiction over contract disputes. However, as stated earlier, representation issues of this kind are within the NLRB's exclusive jurisdiction. In International Bhd. of Boilermakers Local 852 v. Olympic Plating Indus., 870 F.2d 1085, 1089 (6th Cir.1989), we held that the federal courts should decline to exercise jurisdiction over contract disputes that can be resolved before the NLRB:
 
 
 23
 This outcome is particularly appropriate because the instant NLRB proceeding involves a representation issue, i.e., a determination of which union should represent the ... employees.... That [the union] has characterized the instant claim as a § 301 [of the Labor Management Relations Act] contract claim is of no consequence.
 
 
 24
 See also Construction Drivers Local 682 v. Bussen Quarries, Inc., 849 F.2d 1123, 1125 (8th Cir.1988) (representational issue would also resolve contractual issues; court therefore declined to exercise jurisdiction over contractual claim). Parties "cannot avoid a NLRB determination of a representational dispute by characterizing it as an action for breach of contract under a collective bargaining agreement." Local No. 3-193 Int'l Woodworkers v. Ketchikan Pulp Corp., 611 F.2d 1295 (9th Cir.1980). The NLRB will defer to arbitration of representation issues, but will not do so if a party has invoked its authority, or when less than all the parties to the dispute have agreed to arbitrate. Carey v. Westinghouse Elec. Corp., 375 U.S. 261, 272 (1964); NLRB v. Plasterers' Local Union No. 79, 404 U.S. 116, 137 (1971). In this case, Whitehouse and the Painters attempted to arbitrate the case without considering the Teamsters' interests.
 
 
 25
 Whitehouse also contends that the district court acted improperly in permitting the NLRB to intervene in the action below. We disagree. The NLRB's interest in the case is "direct, substantial, and significantly protectable," United States v. Carrols Dev. Corp., 454 F.Supp. 1215, 1219 (N.D.N.Y.1978); see also Donaldson v. United States, 400 U.S. 517, 531 (1971). Under the National Labor Relations Act, Congress granted the NLRB the power to hear and determine allegations of unfair labor practices. This gives the NLRB a public interest, unmatched by any other participant in the case. In light of this Congressional action, Whitehouse's argument that only parties to the arbitration can intervene must be rejected. Obviously, the NLRB does not participate in private arbitration proceedings, yet it clearly has an interest in protecting its jurisdiction. As noted above, the "dispute" in question involved the Painters and Whitehouse, two entities with similar interests, which hid from the district court the entire nature of the dispute.
 
 IV
 
 26
 The NLRB's application for enforcement of its order is GRANTED. The district court's decision to dismiss Whitehouse's claim for want of jurisdiction is AFFIRMED.
 
 
 
 *
 The Honorable Joseph M. Hood, United States District Judge for the Eastern District of Kentucky, sitting by designation